T.C. Memo. 2016-133

UNITED STATES TAX COURT

JACK R. DURLAND, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

TINA D. FAUSETT, Petitioner, AND JACK R. DURLAND, JR., Intervenor <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27534-10, 28396-10.          Filed July 19, 2016.

Jack R. Durland, Jr., pro se.

<u>Scott T. Banks</u> and <u>Kenneth W. Klingenberg</u>, for petitioner in docket No.
28396-10.

<u>Moenika N. Coleman</u>, <u>Heather L. Lampert</u>, and <u>Linda L. Wong</u>, for
respondent.

[*2]                              CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.     Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       A.    Petitioners. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       B.    Mr. Durland's Disbarment. . . . . . . . . . . . . . . . . . . . . . . . . . . 8
       C.    Mr. Durland's Transfers of Assets to the Durland 1995 Irrevocable
             Trust and Ms. Fausett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
       D.    Norris R. Harris. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    Events Occurring During 1999 and 2000. . . . . . . . . . . . . . . . . . . . . . 12
       A.    Mr. Harris Brings Mr. Durland In-House. . . . . . . . . . . . . . . . . . 12
       B.    Checks From T.J. Oil & Gas. . . . . . . . . . . . . . . . . . . . . . . . . . . 13
       C.    Gulfport Oil & Gas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
       D.    Gulfport Oil & Gas' Acquisition of Control of ARXA. . . . . . . . . . 15
       E.    Purported Loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
             1.    $20,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
             2.    $350,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             3.    $65,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
       F.    Matagorda Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
       G.    Gulfport Oil & Gas Checks. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
       H.    Private Investor and Investec Checks. . . . . . . . . . . . . . . . . . . . . 28
       I.    2000 Cashier's Checks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
       J.    Ms. Fausett's Separation From Mr. Durland. . . . . . . . . . . . . . . . 29
       K.    2000 Divorce Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
             1.    2000 Oklahoma Divorce Case. . . . . . . . . . . . . . . . . . . . 32
             2.    Mississippi Divorce Case. . . . . . . . . . . . . . . . . . . . . . . 32
             3.    Ms. Fausett's Meeting With the FBI. . . . . . . . . . . . . . . . 34
             4.    Ms. Fausett's Contempt Hearing. . . . . . . . . . . . . . . . . . 35
       L.    1999 Return. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
       M.    Boleyn Energy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

III.   Events Occurring During 2001 and 2002. . . . . . . . . . . . . . . . . . . . . . 38
       A.    2001 Cashier's Checks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
       B.    Mr. Durland's and Mr. Harris' Assignment of Shares of Gulfport
             Oil & Gas Common Stock to Gulfport Oil & Gas. . . . . . . . . . . . . 39

**[*3]** C.    Checks Issued to Boleyn Energy. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      D.    Prytania Street House. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      E.    Hubbard Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      F.    Mr. Durland's Departure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      G.    2000 and 2001 Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IV.    Events Occurring After 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      A.    Saint Andrews Court House. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      B.    2002-2007 Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      C.    IRS' Investigation of Mr. Durland. . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      D.    Mr. Durland's Transfer of 1,500 Shares of Boleyn Energy
         Common Stock to Rosewood Ventures. . . . . . . . . . . . . . . . . . . . . . 47
      E.    Mr. Durland's Indictment for Tax Evasion. . . . . . . . . . . . . . . . . . . 48
      F.    Mr. Durland's Plea Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
      G.    2007 Oklahoma Divorce Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

V.    Deficiency Notices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

I.    Preliminary Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
      A.    Credibility of Witnesses and Reliability of Documentary Evidence. 52
      B.    Judicial Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      C.    Mr. Durland's Plea Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

II.    Period of Limitations on Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

III.    Unreported Income Adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
      A.    Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
      B.    Specific-Item Method. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
      C.    The Parties' Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
      D.    Specific Items at Issue for 1999. . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
         1.    T.J. Oil & Gas Salary Checks Totaling $55,000. . . . . . . . . . . 62
         2.    Purported Loans Totaling $435,000. . . . . . . . . . . . . . . . . . . . 63
      E.    Specific Items at Issue for 2000. . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
         1.    T.J. Oil & Gas Check for $5,000. . . . . . . . . . . . . . . . . . . . . . 66
         2.    Gulfport Oil & Gas Salary Checks Totaling $122,500. . . . . . 66

**[\*4]**       3.     Checks Payable to T.J. Oil & Gas and Gulfport Oil & Gas... 67
             4.     Cashier's Checks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
     F.     Specific Items at Issue for 2001. . . . . . . . . . . . . . . . . . . . . . . . . 70

IV.    Civil Fraud Penalties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
     A.     Section 6663(a) Generally. . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
     B.     Whether Mr. Durland Is Liable for the Civil Fraud Penalties. . . . . . 73
             1.     Collateral Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
             2.     Underpayment of Tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
             3.     Fraudulent Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
                 a.     Understating Income. . . . . . . . . . . . . . . . . . . . . . . . 76
                 b.     Failing To Maintain Adequate Records.. . . . . . . . . . . 77
                 c.     Offering Implausible or Inconsistent Explanations.. . . 77
                 d.     Concealing Assets or Income.. . . . . . . . . . . . . . . . . . 77
                 e.     Providing Incomplete or Misleading Information to the Taxpayer's Tax Return Preparer. . . . . . . . . . . . . . 78
                 f.     Offering False or Incredible Testimony.. . . . . . . . . . . 79
                 g.     Filing False Documents. . . . . . . . . . . . . . . . . . . . . . . 79
                 h.     Extensive Dealings in Cash. . . . . . . . . . . . . . . . . . . . 80
                 i.     Summary.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

V.     Whether Ms. Fausett Is Jointly and Severally Liable. . . . . . . . . . . . . . . 81
     A.     Joint and Several Liability Generally. . . . . . . . . . . . . . . . . . . . . 81
             1.     Section 6015(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
             2.     Section 6015(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
             3.     Section 6015(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
     B.     Whether Ms. Fausett Is Eligible for Relief Under Section 6015. . . . 89
             1.     Section 6015(c) Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . 89
                 a.     Actual Knowledge. . . . . . . . . . . . . . . . . . . . . . . . . . 90
                     i.     1999. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
                     ii.     2000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
                     iii.     2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
                 b.     Duress Exception. . . . . . . . . . . . . . . . . . . . . . . . . . . 94
             2.     Section 6015(b) Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . 97
             3.     Section 6015(f) Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . 98

VI.    Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

[*5]        MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, <u>Chief Judge</u>:  Respondent determined the following deficiencies in Federal income tax and civil fraud penalties under section 6663(a) with respect to Jack R. Durland, Jr.:[1]

|  | | Penalty |
| Year | Deficiency | sec. 6663(a) |
| --- | --- | --- |
| 1999 | $188,709 | $141,532 |
| 2000 | 556,823 | 417,617 |
| 2001 | 17,653 | 13,240 |

Respondent determined the following deficiencies in Federal income tax with respect to Tina D. Fausett:

| Year | Deficiency |
| --- | --- |
| 1999 | $188,709 |
| 2000 | 556,823 |
| 2001 | 17,653 |

The issues for decision are:  (1) whether respondent issued the notices of deficiency to Mr. Durland and Ms. Fausett before the periods of limitations on assessment expired for 1999-2001; (2) whether Mr. Durland received unreported

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some monetary amounts have been rounded to the nearest dollar.

**[*6]** income of $490,000, $1,552,940, and $45,000 for 1999, 2000, and 2001, respectively; (3) whether Mr. Durland is liable for civil fraud penalties under section 6663(a) of $141,532, $417,617, and $13,240 for 1999, 2000, and 2001, respectively; and (4) whether Ms. Fausett is eligible for relief from joint and several liability for the 1999-2001 deficiencies under section 6015(b), (c), or (f).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and facts drawn from stipulated exhibits are incorporated herein by this reference. Petitioners resided at separate addresses in Oklahoma City, Oklahoma, when they petitioned this Court.

I. Background

A. Petitioners

Mr. Durland received a law degree from the University of Oklahoma College of Law in 1962. He received his license to practice law in Oklahoma in 1962, and he practiced law with the Crowe & Dunlevy law firm from 1962 until 1989. In 1989 he and another attorney formed the Berry & Durland law firm. Berry & Durland subsequently became Durland & Durland; Mr. Durland and his father, Jack Durland, Sr., were the two name partners of the firm. From before

 **[\*7]** 1995 until 1997 Mr. Durland shared office space with an attorney named Darquita Maggard.  Mr. Durland practiced law with Durland & Durland until 1999.

Ms. Fausett attended college for approximately three and a half years at Oklahoma University and Central State College, now the University of Central Oklahoma, where she majored in history and English education but did not earn a degree.

Mr. Durland's parents and Ms. Fausett's parents knew each other, and Ms. Fausett and Mr. Durland saw each other at functions their parents hosted.  During the summer of 1997 Ms. Fausett began working for Mr. Durland as a secretary.  Mr. Durland and Ms. Fausett married on June 26, 1999.

Mr. Durland had two prior marriages before marrying Ms. Fausett.  He and his second wife divorced on December 5, 1995.

Ms. Fausett also was previously married before marrying Mr. Durland.  She married Larry McCall in 1972.  On November 6, 1995, Ms. Fausett filed for divorce from Mr. McCall in the District Court of Oklahoma County, Oklahoma.  After firing her original divorce attorney Ms. Fausett hired Ms. Maggard to represent her in her divorce from Mr. McCall.  The court granted Ms. Fausett a divorce from Mr. McCall on August 16, 1996.

**[*8]** B.     Mr. Durland's Disbarment

Mr. Durland's uncle, William T. Durland, established a trust in September 1992.  Mr. Durland and Judith Ann Pederson, a niece of William Durland, were appointed cotrustees of the trust.  Without Ms. Pederson's or William Durland's knowledge, Mr. Durland withdrew $220,000 from the trust for his personal use.  In a letter dated March 21, 1997, Mr. Durland falsely told Ms. Pederson that the withdrawn funds were invested in certificates of deposit, and he subsequently presented her with forged certificates of deposit.

Mr. Durland later admitted that his initial story was a lie, and he instead claimed to have borrowed the withdrawn funds.  To support his new claim he produced unsigned, backdated promissory notes.

On the basis of Mr. Durland's fraudulent conduct with respect to his uncle's trust the Oklahoma Bar Association brought disciplinary proceedings against him.  Ms. Maggard represented Mr. Durland in those proceedings.  On September 8, 1998, a trial panel of the Supreme Court of Oklahoma found that Mr. Durland had converted for his personal use $220,000 of funds held in trust; had committed various acts of dishonesty, deceit, fraud, and misrepresentation; and had forwarded fraudulent certificates of deposit to Ms. Pederson.  On the basis of these findings,

**[\*9]** the trial panel recommended that he be disbarred. On March 18, 2003, the Supreme Court of Oklahoma disbarred Mr. Durland.

C.  Mr. Durland's Transfers of Assets to the Durland 1995 Irrevocable Trust and Ms. Fausett

On a date that is unclear from the record Mr. Durland signed the agreement for the Jack R. Durland, Jr. 1995 Irrevocable Trust (Durland 1995 Irrevocable Trust), dated December 8, 1995, as the settlor and trustee of the trust.[2] Ms.

---

[2]Respondent contends that Mr. Durland backdated the Durland 1995 Irrevocable Trust. Mr. Durland testified that he did not sign the original trust agreement until 1996 or 1997 (and not in 1995 as the trust agreement states), and the parties stipulated that Mr. Durland and Ms. Fausett first met in December 1996. However, in September 2000 Ms. Fausett met with the Federal Bureau of Investigation (FBI) and stated that Mr. Durland executed the trust agreement in 1996, and this is consistent with the documents dated August 19, 1996, that appointed her as the trustee of the trust. Moreover, the trust agreement refers to Ms. Fausett primarily as Ms. McCall--her legal name in December 1995--and the trust agreement and the documents dated August 19, 1996, are all notarized. Ms. Fausett also testified that her parents and Mr. Durland's parents knew each other before Mr. Durland and Ms. Fausett began dating and that she had previously met Mr. Durland at functions their parents hosted.

Additionally, Ms. Maggard--who was then sharing an office with Mr. Durland--testified that she first met Ms. Fausett at the end of 1995 or during 1996 and that she represented Ms. Fausett before her divorce from Mr. McCall on August 16, 1996. Ms. Fausett testified that Mr. Durland assisted her in her efforts to gain full custody of her son. In the light of Ms. Fausett's statement to the FBI in September 2000, her and Ms. Maggard's testimony at trial, and the documentary evidence, we find it unlikely that Mr. Durland and Ms. Fausett first met in December 1996. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989) (disregarding a stipulation as inconsistent with a stipulated exhibit).

(continued...)

[*10] Fausett, then referred to as Ms. McCall, was named the beneficiary of the trust. Ms. Fausett was entitled to all income earned by the assets in the trust during Mr. Durland's lifetime, and after his death the trust's assets were to be distributed to her. In the event Ms. Fausett died before Mr. Durland, the trust's assets were to be distributed to Mr. Durland's descendants. In documents dated August 19, 1996, Mr. Durland resigned, and Ms. Fausett was appointed trustee of the trust. Ms. Fausett signed the document appointing her the trustee on August 19, 1996.

In an attachment to the original trust agreement Mr. Durland purported to transfer 195 items of personal and real property to the trustee of the trust. Included in these items were oil, gas, and other mineral interests owned by three partnerships and a 1991 Mercedes.

Additionally, in 1998 Mr. Durland conveyed mineral rights in certain properties in several counties of Oklahoma and real property in Oklahoma and Colorado to Ms. Fausett.

---

[2](...continued)
We do not find Mr. Durland's testimony that he backdated the Durland 1995 Irrevocable Trust agreement to be credible, and we are not persuaded that it was.

[*11] During the years in issue Ms. Fausett maintained a brokerage account at Merrill Lynch (Fausett Merrill Lynch account). In January 2000 she opened a brokerage account at Charles Schwab (Fausett Charles Schwab account).

D.    Norris R. Harris

In 1977 Norris R. Harris hired Mr. Durland as an attorney for an oil company, Centex Oil, that he had started in 1976. Mr. Harris attended junior college in Odessa, Texas. He began working in the oil industry in 1956, and during the relevant periods owned interests in a variety of business entities. Mr. Durland subsequently provided legal services to a number of those entities, including T.J. Oil & Gas, Inc. (T.J. Oil & Gas), and Covington Energy, Inc. (Covington Energy). T.J. Oil & Gas and Covington Energy had their principal places of business at the same address in Gulfport, Mississippi.

During the years in issue Mr. Harris was married to Cindy Harris. He has a son, Jonathan G. Harris, from a previous marriage.

During the years in issue Mr. Harris employed Jonathan Harris and Teresa Richardson in connection with his various businesses. He hired Ms. Richardson in June 1999.

Mr. Harris had a close relationship with Betty L. Ferguson, who owned a check cashing business that did business as Ferguson Check Cashing Co.

[*12] (Ferguson Check Cashing).  Mr. Harris regularly sent others to cash personal checks for him at Ferguson Check Cashing.

II.    Events Occurring During 1999 and 2000

    A.    Mr. Harris Brings Mr. Durland In-House

In 1998, while Mr. Durland's disciplinary proceedings were pending, Mr. Harris asked Mr. Durland to move to Gulfport to help him manage his oil and gas businesses.  On December 10, 1998, Mr. Durland signed an employment agreement with Covington Energy.  The employment agreement provided that Mr. Durland would receive an annual salary of $120,000 from Covington Energy.  In January 1999 Mr. Durland moved to Gulfport to work for Mr. Harris and his various businesses.

In early 1999 Mr. Durland and Mr. Harris called Ms. Fausett to convince her to join Mr. Durland in Gulfport.  They offered to hire Ms. Fausett as Mr. Durland's secretary.

In June 1999 Ms. Fausett moved to Gulfport.  On June 24, 1999, Mr. Durland purchased a 3.8-carat diamond ring for $19,380.  On June 26, 1999, Mr. Durland and Ms. Fausett married, and he gave the 3.8-carat diamond ring to her as her wedding band.

[*13] B.     Checks From T.J. Oil & Gas

After Mr. Durland began working for Mr. Harris, he received the following

checks from T.J. Oil & Gas during 1999:

| Check No. | Date | Memo line | Amount |
|---|---|---|---|
| 1013 | 1/13 | illegible | $5,000 |
| 1048 | 1/26 | "salary" | 7,500 |
| 1065 | 2/4 | --- | 5,000 |
| 1084 | 2/16 | --- | 7,500 |
| 1122 | 3/5 | "salary March" | 5,000 |
| 1137 | 3/15 | "salary Mar 15 99" | 5,000 |
| 1515 | 4/1 | "salary April 1 99" | 5,000 |
| 1554 | 4/15 | --- | 5,000 |
| 1587 | 4/30 | "salary 5-1-99" | 5,000 |
| 1613 | 5/14 | "legal fees and consulting" | 5,000 |
| Total | | | 55,000 |

Mr. Durland cashed these checks at Ferguson Check Cashing.  Petitioners did not

report these amounts on their 1999 return.

On a date that is unclear from the record Mr. Durland executed a backdated

$55,000 promissory note payable to T.J. Oil & Gas.[3]  The promissory note called

for annual interest payments and two principal payments, none of which were

made.

---

[3]The promissory note is dated January 1, 1999.  However, it is signed by
Ms. Richardson, who began working for Mr. Harris in June 1999.

**[\*14]** Jonathan Harris also executed a backdated $23,000 promissory note payable to T.J. Oil & Gas.[4] The promissory note called for annual interest payments and two principal payments, none of which were made.

On June 1, 2000, T.J. Oil & Gas issued a $5,000 check to Mr. Durland. The memo line on the check stated, "Loan from Corporation". Mr. Durland cashed the check at Ferguson Check Cashing. Petitioners did not report this amount on their 2000 return.

C.    Gulfport Oil & Gas

On or about April 12, 1999, Mr. Harris and Mr. Durland incorporated Gulfport Oil & Gas, Inc. (Gulfport Oil & Gas). On April 30, 1999, Mr. Harris, on behalf of Gulfport Oil & Gas, and Mr. Durland executed a three-year employment agreement. The employment agreement provided that Mr. Durland (1) would receive an annual salary of $120,000; (2) would be the vice president of Gulfport Oil & Gas; (3) would be granted 39% of the common stock of Gulfport Oil & Gas; (4) would be entitled to a 39% working interest in any oil and gas leases acquired by Gulfport Oil & Gas in Mississippi, Louisiana, and Texas or from Hawkins Ranch, Ltd. (Hawkins Ranch), a limited partnership that owned an oil and gas

---

[4]The promissory note was also dated January 1, 1999. However, it too is signed by Ms. Richardson, who began working for Mr. Harris in June 1999.

[*15] lease in Matagorda County, Texas; and (5) would have the right to assign his working interest in any oil and gas leases to a third party.

On June 7, 1999, Mr. Harris and Mr. Durland entered into an agreement with respect to the ownership of the common stock of Gulfport Oil & Gas. The agreement provided, among other things, that Mr. Harris and Mr. Durland would own 61% and 39%, respectively, of the common stock of Gulfport Oil & Gas. Ms. Fausett and Mrs. Harris signed the June 7, 1999, agreement as witnesses.

On dates that are unclear from the record Mr. Durland discussed with Mr. Harris and Gene Gibbons, a certified public accountant for an accounting firm in Mobile, Alabama, then named Gibbons, Gibbons & Buck, PC (Gibbons, Gibbons & Buck), whether to file Federal income tax returns for Gulfport Oil & Gas. Gulfport Oil & Gas did not file any returns for the years at issue.

D.     Gulfport Oil & Gas' Acquisition of Control of ARXA

In May 1999 Gulfport Oil & Gas entered into an agreement with ARXA International Energy, Inc. (ARXA), a publicly traded company, to purchase 6 million shares of ARXA common stock at 20 cents per share. After purchasing the 6 million shares of ARXA common stock Gulfport Oil & Gas held a controlling interest in ARXA.

[*16] On May 27, 1999, Gulfport Oil & Gas opened a brokerage account with Investec Ernst & Co. (Gulfport Oil & Gas Investec account). Gulfport Oil & Gas held some of its ARXA common stock in the Gulfport Oil & Gas Investec account.

On August 23, 1999, Mr. Durland wrote a letter to Mr. Gibbons regarding ARXA's Federal income tax reporting. In the letter Mr. Durland stated as follows:

> Since May 7, 1999, we have been paying salaries out of ARXA without deducting for Federal Income Tax and State of Mississippi Income Tax. There have also been no deductions for Social Security payments. We discussed this with you, and you indicated you would treat the prior payments as loans and we would start withholding the next quarter.

ARXA did not file any returns for the years at issue.

E.    Purported Loans

In 1999 Mr. Harris and Mr. Durland received the following purported loans --which they never repaid--from Gulfport Oil & Gas:

| Mr. Harris[1] | | | Mr. Durland | | |
|---|---|---|---|---|---|
| Check No. | Date | Amount | Check No. | Date | Amount |
| 1029[2] | 6/11 | $125,500 | [5]1054 | 6/24 | $20,000 |
| 1092[3] | 7/12 | 335,000 | [6]1090 | 7/15 | 350,000 |
| 0524[4] | 10/19 | 75,000 | [7]0537 | 10/28 | 65,000 |
| Total | | 535,500 | Total | | 435,000 |

[1] Mrs. Harris was the payee on all of the purported loan checks.

[2] The memo line on check No. 1029 bore the notation "Loan from company".

[3] The memo line on check No. 1092 bore the notation "Loan from company in advance on Deed of Trust". Mr. Harris used this check to pay off a defaulted mortgage on his and Mrs. Harris' home in Long Beach, Mississippi. On July 16, 1999, Mr. Harris and Mrs. Harris executed a land deed of trust in favor of Gulfport Oil & Gas encumbering their home in Long Beach, Mississippi, in connection with a promissory note for a $335,000 loan. The land deed of trust was recorded on July 19, 1999.

[4] The memo line on check No. 0524 bore the notation "loan from corporation".

[5] Mr. Durland and Jonathan Harris signed check No. 1054.

[6] Mr. Durland and Jonathan Harris signed check No. 1090, and the memo line on the check states "loan from company and advance on land deed of trust".

[7] Mr. Durland and Mr. Harris signed check No. 0537, and the memo line on the check states "loan from corporation".

Mr. Durland documented the purported loans that he received from Gulfport Oil & Gas as follows.

1.  $20,000

On a date that is unclear from the record Mr. Durland executed a $20,000 promissory note dated June 25, 1999, payable to Gulfport Oil & Gas. The promissory note called for annual interest payments and two principal payments, none of which were made. Mr. Harris and Mrs. Harris signed the promissory note as witnesses. Mr. Durland executed a security agreement dated June 30, 1999, granting Gulfport Oil & Gas a security interest in Ms. Fausett's wedding band. On

[*18] August 16, 2000, in connection with divorce proceedings then occurring in Mississippi between Mr. Durland and Ms. Fausett, a State of Mississippi UCC-1 financing statement was filed with respect to the purported $20,000 loan. Mr. Durland, as debtor, and Mr. Harris, as president of Gulfport Oil & Gas, signed the UCC-1 financing statement.

2.    $350,000

On a date that is unclear from the record Mr. Durland and Ms. Fausett executed a $350,000 promissory note, dated July 16, 1999, payable to Gulfport Oil & Gas.[5] The promissory note called for annual interest payments and two principal payments, none of which were made. Mr. Harris signed the July 16, 1999, promissory note as witness.

On October 16, 1999, Mr. Durland and Ms. Fausett signed a contract to purchase a house on 54th Street in Gulfport, Mississippi (54th Street house) for $407,500. On November 2, 1999, Ms. Fausett closed on the 54th Street house, and only her name appears on the deed. On November 3, 1999, Mr. Durland and Ms. Fausett executed a land deed of trust in favor of Gulfport Oil & Gas

---

[5]In September 2000 Ms. Fausett stated to the FBI that she signed the July 16, 1999, promissory note on November 14, 1999.

[*19] encumbering the 54th Street house in connection with the $350,000 promissory note.  The land deed of trust was recorded on November 30, 1999.

      3.    $65,000

On November 15, 1999, Ms. Fausett purchased a 2000 Jaguar XK8 for $72,570.  Ms. Fausett used the proceeds from cashing check No. 0537 to purchase the 2000 Jaguar.

On a date that is unclear from the record Mr. Durland executed a $65,000 promissory note, dated October 28, 1999, payable to Gulfport Oil & Gas.  The promissory note called for annual interest payments and two principal payments, none of which were made.  Mr. and Mrs. Harris signed the promissory note as witnesses.

On a date that is unclear from the record Mr. Durland executed a security agreement dated October 28, 1999, granting Gulfport Oil & Gas a security interest in the 2000 Jaguar.  On August 16, 2000, in connection with divorce proceedings then occurring in Mississippi between Mr. Durland and Ms. Fausett, a State of Mississippi UCC-1 financing statement was filed with respect to the purported $65,000 loan.  Mr. Durland, as debtor, and Mr. Harris, as president of Gulfport Oil & Gas, signed the UCC-1 financing statement.

[*20] F.    <u>Matagorda Lease</u>

On June 29, 1999, Gulfport Oil & Gas and Hawkins Ranch entered into an oil and gas lease with respect to a 672-acre property in Matagorda County, Texas (Matagorda lease). Included in the Matagorda lease were Hawkins Ranch Well No. 1, Lewis Ranch Well No. 4, and Lewis Ranch Well No. 5. The Matagorda lease was recorded on July 7, 1999.

On July 14, 1999, Gulfport Oil & Gas, Mrs. Harris, and Ms. Fausett executed an assignment transferring a 61% interest in the June 29, 1999, lease of Lewis Ranch Well No. 4 and Lewis Ranch Well No. 5 to Mrs. Harris and a 39% interest in that lease to Ms. Fausett. The July 14, 1999, assignment had an effective date of May 2, 1999; was signed by Mr. Durland on behalf of Gulfport Oil & Gas, Mrs. Harris, and Ms. Fausett; and was recorded on July 22, 1999.[6]

_____

[6]On November 16, 1999, Gulfport Oil & Gas, Mrs. Harris, and Ms. Fausett executed an assignment transferring a 61% interest in the June 29, 1999, lease of Hawkins Ranch Well No. 1 to Mrs. Harris and a 39% interest in that lease to Ms. Fausett. The November 16, 1999, assignment had an effective date of September 10, 1999; was signed by Mr. Durland on behalf of Gulfport Oil & Gas, Mrs. Harris, and Ms. Fausett; and was recorded on December 2, 1999. The November 16, 1999, assignment relates to the same underlying property as the July 14, 1999, assignment, and it is unclear from the record why a second assignment was required.

[*21] After August 22, 1999, Gulfport Oil & Gas, Mrs. Harris, and Ms. Fausett

entered into an operating agreement dated May 2, 1999.[7]  Although the operating

agreement in the record is dated May 2, 1999, the operating agreement originally

had a later date that was subsequently altered without Ms. Fausett's knowledge.

Additionally, several clauses were later added to the May 2, 1999, operating

agreement without Ms. Fausett's knowledge.  As modified, the May 2, 1999,

operating agreement provided that (1) Gulfport Oil & Gas would operate Lewis

Ranch Well No. 4, Lewis Ranch Well No. 5, and Hawkins Ranch Well No. 1; (2)

Gulfport Oil & Gas was required to open its records to inspection by Mrs. Harris

and Ms. Fausett; (3) Gulfport Oil & Gas could collect all income earned from

Lewis Ranch Well No. 5 and all other wells drilled and completed on the 672-acre

property in Matagorda County, Texas, until Mrs. Harris and Ms. Fausett paid all

---

[7]The parties stipulated that the May 2, 1999, operating agreement was signed on that date.  However, we do not find this stipulation to be credible because the agreement refers to Ms. Fausett as Tina Fausett Durland and on May 2, 1999, Mr. Durland and Ms. Fausett had not yet married; the agreement was notarized by Ms. Richardson, who began working for Gulfport Oil & Gas in June 1999; and the May 2, 1999, operating agreement refers to assignments of Gulfport Oil & Gas' interest in the Matagorda lease to Mrs. Harris and Ms. Fausett that were executed on July 14 and November 16, 1999.  Additionally, in September 2000 Ms. Fausett stated to the FBI that she first began working on the May 2, 1999, operating agreement on August 22, 1999.  For these reasons we disregard the stipulation as inconsistent with stipulated exhibits in the record.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195.

[*22] expenses related to those wells; and (4) the May 2, 1999, operating agreement was subject to the terms of an agreement dated May 1, 1999, and entered into by Gulfport Oil & Gas, Mr. Harris, and Mr. Durland.

After Gulfport Oil & Gas, Mrs. Harris, and Ms. Fausett executed the May 2, 1999, operating agreement, Gulfport Oil & Gas, Mr. Harris, and Mr. Durland entered into an agreement dated May 1, 1999.[8] The May 1, 1999, agreement provided, in relevant part, that (1) Mr. Harris and Mr. Durland agreed that Gulfport Oil & Gas would assign its interest in Lewis Ranch Well No. 5 to Mrs. Harris and Ms. Fausett; (2) Mrs. Harris and Ms. Fausett would be responsible for all costs and expenses relating to Lewis Ranch Well No. 5 and the drilling and completion of all other wells on the property subject to the Matagorda lease; and (3) the related operating agreement would be subject to the May 1, 1999, agreement.

---

[8]The parties stipulated that the May 1, 1999, agreement was signed on that date. However, we do not find this stipulation to be credible because the agreement refers to Ms. Fausett as Tina Fausett Durland and on May 1, 1999, Mr. Durland and Ms. Fausett had not yet married. Additionally, it appears that the purpose of the May 1, 1999, agreement was to insert additional terms into the May 2, 1999, operating agreement, and we found that the May 2, 1999, agreement was executed after August 22, 1999. For these reasons we disregard the stipulation as inconsistent with stipulated exhibits in the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195.

[*23] Gulfport Oil & Gas extracted gas from the wells on the property subject to the Matagorda lease and sold the gas to Eagle Energy Development Co. (Eagle Energy). Eagle Energy was supposed to issue production checks to Gulfport Oil & Gas, and Gulfport Oil & Gas in turn was supposed to issue checks to the lessors of the Matagorda lease.

Eagle Energy issued the following production checks to ARXA, Gulfport Oil & Gas, and Gulfport Ventures:[9]

---

[9]ARXA previously had a lease on the property subject to the Matagorda lease. It is unclear from the record what Gulfport Ventures is, why Eagle Energy issued production checks to it, and why Gulfport Oil & Gas cashed its production checks.

[*24]

| Check No. | Date | Payee | Amount |
|-----------|------|-------|--------|
| 5125 | 7/29/1999 | ARXA | $96,083 |
| 5199 | 8/31/1999 | Gulfport Oil & Gas | 106,450 |
| 5255 | 9/30/1999 | Gulfport Oil & Gas | 117,828 |
| N/A | 10/29/1999 | Gulfport Oil & Gas | 120,686 |
| 5395 | 11/30/1999 | Gulfport Oil & Gas | 50,160 |
| 5452 | 12/30/1999 | Gulfport Oil & Gas | 81,206 |
| 5526 | 1/31/2000 | Gulfport Oil & Gas | 47,789 |
| 5580 | 3/1/2000 | Gulfport Oil & Gas | 84,151 |
| 5641 | 3/31/2000 | Gulfport Oil & Gas | 68,784 |
| 5696 | 4/28/2000 | Gulfport Oil & Gas | 56,292 |
| 5731 | 5/25/2000 | Gulfport Oil & Gas | 67,221 |
| 5814 | 6/30/2000 | Gulfport Oil & Gas | 95,955 |
| 5876 | 7/28/2000 | Gulfport Oil & Gas | 171,592 |
| 5967 | 8/30/2000 | Gulfport Oil & Gas | 149,317 |
| 6029 | 9/30/2000 | Gulfport Oil & Gas | 73,114 |
| 6038 | 9/30/2000 | Gulfport Ventures | 91,717 |
| 6103 | 10/30/2000 | Gulfport Oil & Gas | 71,197 |
| 6114 | 10/31/2000 | Gulfport Ventures | 201,875 |

With Mr. Harris' approval Mr. Durland cashed check Nos. 5731, 5814, 5876, 5967, 6029, 6038, 6103, and 6114 at Ferguson Check Cashing. The checks that Mr. Durland cashed at Ferguson's Check Cashing totaled $921,988.

Gulfport Oil & Gas paid out the amounts on the production checks that Eagle Energy issued to it or ARXA from July 1999 until April 2000 to Ms. Fausett (or Mr. Durland in certain months) and Mrs. Harris in accordance with Ms. Fausett and Mrs. Harris' interests in the Matagorda lease. However, it did not pay out any

[*25] amounts from the production checks during the period in which Mr. Durland

cashed the production checks from Eagle Energy at Ferguson Check Cashing.

Gulfport Oil & Gas issued the following checks to Ms. Fausett or Mr.

Durland and Mrs. Harris:

| | Ms. Fausett or Mr. Durland | | Mrs. Harris | |
|---|---|---|---|---|
| Date | Check No. | Amount | Check No. | Amount |
| 7/29/1999 | 1010 | $3,664 | --- | --- |
| 7/30/1999 | 1014 | 37,472 | 1012 | $58,611 |
| 9/1/1999 | 1018 | 41,516 | 1017 | 64,935 |
| 10/1/1999 | 0302 | 45,953 | 0301 | 71,875 |
| 11/1/1999 | 0548 | 47,068 | 0547 | 73,619 |
| 12/1/1999 | 0619 | 19,562 | 0618 | 30,597 |
| 1/3/2000 | 0667 | 31,670 | 0666 | 49,536 |
| 2/1/2000 | 0724 | 18,638 | 0723 | 29,151 |
| 3/3/2000 | 0779 | [1]32,819 | 0778 | 51,332 |
| 4/3/2000 | 0831 | [1]26,826 | 0830 | 41,958 |
| 5/1/2000 | 0874 | [1]21,954 | 0873 | 34,338 |
| Total | | 327,142 | | 505,952 |

[1]These checks were made payable to Mr. Durland.  The
remainder were made payable to Ms. Fausett.

Mr. Durland cashed the checks made payable to him at Ferguson Check Cashing.

Mr. Durland told Ms. Fausett on May 15, 2000, that he had been receiving the

production checks.  Petitioners reported the amounts on these checks on their 1999

and 2000 returns.

**[*26]**      G.      <u>Gulfport Oil & Gas Checks</u>

On February 15, 2000, Gulfport Oil & Gas issued check No. 0750 to Mr. Durland for $3,503.  The memo line on the check states "$5,000 gross salary" and notes withholding for Medicare, Social Security, Federal income tax, and Mississippi State income tax.  Petitioners reported the amount on this check on their 2000 return.

Gulfport Oil & Gas also issued the following checks to Mr. Durland in 2000:

[*27]

| Check No. | Date | Memo line | Amount |
|-----------|------|-----------|--------|
| 0826 | 3/31 | "Loan from corporation" | $5,000 |
| 0855 | 4/14 | "Loan from corporation" | 5,000 |
| 0872 | 4/26 | "Loan from corporation" | 5,000 |
| 0891 | 5/15 | "Loan from corporation" | 5,000 |
| 0922 | 6/19 | "Loan from corporation" | 5,000 |
| 0946 | 6/27 | "Repayment of loan to Gulfport Oil & Gas, Inc." | 15,000 |
| 0966 | 6/30 | "Loan from corporation" | 5,000 |
| 0983 | 7/14 | "Loan from corporation" | 5,000 |
| 1001 | 7/28 | "Loan from corporation" | 5,000 |
| 1015 | 8/15 | "Loan from corporation" | 5,000 |
| 1059 | 9/1 | "Loan from corporation" | 5,000 |
| 1076 | 9/15 | "Loan from corporation" | 5,000 |
| 1097 | 10/13 | "Loan from corporation" | 10,000 |
| 1103 | 10/13 | "Repayment of principle of loan to corporation" | 17,500 |
| 1104 | 10/13 | "Repayment of principle of loan to corporation" | 15,000 |
| 1151 | 11/1 | "Loan from corporation" | 5,000 |
| 1162 | 11/15 | "Loan from corporation" | 5,000 |
| Total | | | 122,500 |

Petitioners did not report these amounts on their 2000 return.[10]

---

[10]Gulfport Oil & Gas also issued checks totaling $152,500 to Mr. and Mrs. Harris in 2000. The memo lines on many of these checks bore notations indicating that the checks were for loans from Gulfport Oil & Gas or repayments of loans made to Gulfport Oil & Gas.

[*28] On August 16, 2000, Gulfport Oil & Gas issued a $12,500 check to T.J. Oil & Gas. With Mr. Harris' approval Mr. Durland cashed the check at Ferguson Check Cashing. Petitioners did not report this amount on their 2000 return.

### H.    Private Investor and Investec Checks

During 2000 Gulfport Oil & Gas sold some of its ARXA common stock to private investors, and it received checks from those investors in amounts totaling $327,200. Additionally, during 2000 Gulfport Oil & Gas sold some of the ARXA common stock that it held in its Investec account, and it received checks in amounts totaling $163,752 from Investec for its ARXA stock. Ms. Fausett witnessed promissory notes for some stock purchases.[11] With Mr. Harris' approval Mr. Durland cashed the private investor and Investec checks at Ferguson Check Cashing. Petitioners did not report these amounts on their 2000 return.

### I.    2000 Cashier's Checks

In 2000 Mr. Durland purchased the following cashier's checks from Whitney National Bank with cash:

---

[11]Ms. Fausett stated to the FBI in September 2000 that Gulfport Oil & Gas was "bailing and selling" ARXA stock.

[*29]

| Check No. | Date | Payee | Remitter line | Amount |
|---|---|---|---|---|
| 08305 | 6/26 | Merrill Lynch | "Gulfport Oil and Gas Inc." | $30,000 |
| 08637 | 9/25 | Merrill Lynch | "Jack R. Durland Jr." | 35,000 |
| 08676 | 10/2 | Merrill Lynch | "Jack R. Durland Jr." | 22,930 |
| 08690 | 10/3 | Merrill Lynch | "Jack R. Durland Jr." | 30,000 |
| 08807 | 11/2 | Merrill Lynch | "Deposit for account of Gulfport Oil & Gas Inc.-- Jack R. Durland Jr." | 56,618 |
| 08945 | 12/19 | Gulfport Oil & Gas | "Payment of Royalties on Matagorda County, TX Properties--Jack R. Durland Jr." | 30,000 |
| Total | | | | 204,548 |

Mr. Durland deposited the cashier's checks into a Merrill Lynch account owned by Gulfport Oil & Gas.

### J. Ms. Fausett's Separation From Mr. Durland

In the latter half of 1999 Ms. Fausett became concerned about certain documents she had signed at Mr. Durland's request. She began asking Mr. Durland for copies of documents she had signed and for records relating to the Matagorda lease. Mr. Durland refused to give Ms. Fausett the documents and records, and eventually he told her that Mr. Harris did not want her to have them.

On December 30, 1999, Ms. Fausett separated from Mr. Durland and moved back to Oklahoma City. On or about January 24, 2000, she moved back to

[*30] Gulfport with Mr. Durland. On February 25, 2000, she again separated from him and moved back to Oklahoma City.

In early 2000 Mr. Durland sent a check for $25,000 drawn on the Fausett Merrill Lynch account to the Internal Revenue Service (IRS). Mr. Durland also told Ms. Fausett that he had filed for both of them a Form 4868, Application for Automatic Extension of Time To File U.S. Individual Income Tax Return, for tax year 1999. On April 12, 2000, Ms. Fausett contacted the IRS, and an IRS employee informed her that the $25,000 check had not been credited to her and that no Forms 1099 had been filed showing income to her.

On April 19, 2000, Mr. Durland told Ms. Fausett that he did not want to obtain releases on the promissory note and the deed of trust relating to the 54th Street house because "there is no tax liability on loans." Ms. Fausett testified that Mr. Durland also told her "about a case he handled where they never paid back the loans and the IRS never caught it."

On April 30 and again on May 15, 2000, Mr. Durland asked Ms. Fausett to execute a will naming him as the sole beneficiary. Fearing for her safety Ms. Fausett declined. Mr. Durland also told Ms. Fausett that the purpose of the well

[*31] assignments was to take money out of Gulfport Oil & Gas and to protect him and Mr. Harris.[12]

On May 31, 2000, Ms. Fausett again contacted the IRS. An IRS employee informed her that a Form 4868 was filed for Mr. Durland but not for her and that she would have to file a joint return to avoid late filing penalties.

In June 2000 Ms. Fausett learned that liens had been filed on the wells subject to the Matagorda lease because Gulfport Oil & Gas had not paid the people working on the wells. Ms. Fausett hired an attorney from Piedmont, Oklahoma, to help her get documents and records from Mr. Durland and Gulfport Oil & Gas. The attorney wrote letters and made phone calls to Mr. Durland, Mr. Harris, Gulfport Oil & Gas, and Eagle Energy, but he was unable to secure any of the records relating to the Matagorda lease.

On June 21, 2000, Mr. Durland called Ms. Fausett and told her that the wells subject to the Matagorda lease were only nominally assigned to her and Mrs. Harris and that he and Mr. Harris were the true owners of those wells. He further told her that, pursuant to the May 2, 1999, operating agreement, she owed

_____

[12]Previously, Mr. Durland had told Ms. Fausett that the purpose of the well assignments was to protect Ms. Fausett and Mrs. Harris.

[*32] hundreds of thousands of dollars to Gulfport Oil & Gas for expenses incurred on wells subject to the Matagorda lease.

Ms. Fausett went with Ms. Maggard to Bay City, Texas, to find an attorney licensed to practice law in Texas. Ms. Fausett subsequently filed a lawsuit against Gulfport Oil & Gas and Eagle Energy in the District Court for Matagorda County, Texas, for the purposes of obtaining documents and records relating to the Matagorda lease and protecting her interest in the lease.

### K. 2000 Divorce Proceedings

#### 1. 2000 Oklahoma Divorce Case

On June 30, 2000, Ms. Fausett filed for divorce from Mr. Durland in the District Court of Oklahoma County, Oklahoma (2000 Oklahoma divorce case). Ms. Fausett retained an attorney, Anita F. Sanders, to represent her in the 2000 Oklahoma divorce case. Ms. Fausett transferred $65,000 that she had previously received under the Matagorda lease into Ms. Sanders' trust fund account.

#### 2. Mississippi Divorce Case

Meanwhile, on July 12, 2000, Mr. Durland filed for divorce from Ms. Fausett in the Chancery Court of Harrison County, Mississippi (Mississippi divorce case). Ms. Fausett retained an attorney to represent her in the Mississippi divorce case.

[*33] On July 19, 2000, Mr. Durland filed a financial statement in the Mississippi divorce case that stated that he had (1) no income since March 15, 2000; (2) monthly living expenses of $1,415; and (3) total liabilities of $357,000.

On July 27, 2000, Ms. Fausett's Mississippi attorney filed a motion for temporary relief in the Mississippi divorce case.[13]  On July 27, 2000, the court in the Mississippi divorce case issued a temporary order that (1) Mr. Durland pay spousal support of $4,000 per month to Ms. Fausett; (2) Mr. Durland provide an accounting of Ms. Fausett's share of the income from the wells on the property subject to the Matagorda lease; (3) Mr. Durland and Ms. Fausett exchange income tax data; and (4) funds from the Matagorda lease be deposited with Gulfport Oil & Gas.

On August 3, 2000, Mr. Durland filed a motion to amend the July 27, 2000, temporary order in the Mississippi divorce case.  On August 10, 2000, Mr. Durland filed a supplemental motion to amend the temporary order; notices of hearing regarding the motion and supplemental motion to amend the temporary order; and an amended financial statement.  The notices of hearing set a hearing date of August 11, 2000.  In the amended financial statement Mr. Durland stated

---

[13]Ms. Fausett testified that she eventually fired her Mississippi attorney because he failed to file documents and records on her behalf.

**[*34]** that he (1) had not received any salary from Gulfport Oil & Gas and ARXA since January 1 and March 15, 2000, respectively; (2) had monthly living expenses of $1,692; and (3) had total liabilities of $1,346,974.

On August 15, 2000, the court in the Mississippi divorce case issued a supplemental temporary order that (1) the balances in the Fausett Merrill Lynch and Fausett Charles Schwab accounts be frozen; (2) Ms. Fausett deposit $65,000 into the registry of the court; (3) Ms. Fausett be enjoined from pursuing her civil action against Gulfport Oil & Gas and Eagle Energy in the District Court for Matagorda County, Texas; (4) Ms. Fausett provide within seven days the account statements for the Fausett Merrill Lynch and Fausett Charles Schwab accounts to Mr. Durland's attorney; and (5) Mr. Durland provide an accounting of the income and expenses of Gulfport Oil & Gas to Ms. Fausett.

### 3. Ms. Fausett's Meeting With the FBI

On or about September 1, 2000, Ms. Fausett met with the FBI at Ms. Sanders' law office. At the meeting Ms. Fausett discussed with the FBI her concerns about Mr. Durland's and Mr. Harris' activities. She provided the FBI with three "lists" in which she expressed those concerns and what she knew about Mr. Durland, Mr. Harris, and their business associates.

[*35] In the lists Ms. Fausett stated that she knew Mr. Durland received a salary of $10,000 per month from one of Mr. Harris' businesses and that Mr. Gibbons had told Mr. Durland that they could report Mr. Durland's salary as a loan to avoid paying taxes.[14]  Ms. Fausett also stated to the FBI that Mr. Durland had received the purported loans from Gulfport Oil & Gas, see supra part II.E, but never planned to repay the amounts and that the loans were intended to avoid their having to pay taxes.

### 4.    Ms. Fausett's Contempt Hearing

Mr. Durland filed a motion to modify the August 15, 2000, supplemental temporary order and to hold a contempt hearing.  On September 7, 2000, the court in the Mississippi divorce case issued a second supplemental temporary order. The second supplemental temporary order found that Ms. Fausett had not deposited the $65,000 with the court's registry and had not provided copies of the Fausett Merrill Lynch and Fausett Charles Schwab account statements to Mr. Durland.  Consequently, the court ordered that (1) Ms. Fausett deposit the $65,000 to the court's registry within 24 hours from the date of the order; (2) Mr. Durland no longer be required to pay temporary spousal support to Ms. Fausett; (3) Ms.

---

[14]Ms. Fausett stated that in a court hearing on May 10, 2000, Mr. Durland testified that he had not received a salary since March 15, 2000, and Ms. Fausett wrote that she "know[s] for a fact he was still getting salary."

[*36] Fausett deliver within five days the 2000 Jaguar and her wedding band to the court clerk; (4) Ms. Fausett deliver within three days copies of the Fausett Merrill Lynch and Fausett Charles Schwab account statements to Mr. Durland's attorney; (5) Ms. Fausett appear for a hearing to show cause why she should not be held in contempt of court; (6) Mr. Durland be relieved of any obligation to render an accounting of the income and expenses of Gulfport Oil & Gas; and (7) Ms. Fausett file a motion to dismiss her civil action against Gulfport Oil & Gas and Eagle Energy in the District Court for Matagorda County, Texas.

Ms. Fausett's contempt hearing in the Mississippi divorce case was set for September 25, 2000. By then she had retained a new attorney. When she arrived for the hearing, she learned that the hearing had been postponed because of a bomb threat. When the hearing finally convened, her new attorney was not present, and the presiding judge required her to represent herself at the hearing. The presiding judge ordered Ms. Fausett to deposit her wedding band and a check drawn on Ms. Sanders' trust fund account with the court and to call Ms. Sanders and direct her to file a motion to dismiss the 2000 Oklahoma divorce case. On September 28, 2000, Ms. Fausett filed a motion to dismiss the 2000 Oklahoma divorce case.

[*37] After the September 25, 2000, contempt hearing Mr. Durland told Ms. Fausett that he would agree to settle the Mississippi divorce case if Ms. Fausett agreed to certain conditions. Mr. Durland wanted Ms. Fausett to return to Gulfport, but she refused. Instead, they agreed that Ms. Fausett would move to New Orleans, Louisiana. Mr. Durland also demanded that Ms. Fausett agree to form a new entity to receive the income earned under the Matagorda lease and to sign a joint Federal income tax return for 1999. On October 25, 2000, Mr. Durland and Ms. Fausett filed a stipulation to have the Mississippi divorce case dismissed.

L.    1999 Return

On October 16, 2000, Mr. Durland and Ms. Fausett filed a joint Form 1040, U.S. Individual Income Tax Return, for 1999 (1999 return). On their 1999 return petitioners reported wages, taxable interest, Schedule E income, and total income of $25,000, $7,714, $95,544, and $178,761, respectively. On the attached Schedule E, Supplemental Income and Loss, petitioners reported royalties, expenses, depreciation expense or depletion, and net income of $209,521, $67,883, $46,094, and $95,544, respectively. Gibbons, Gibbons & Buck prepared the 1999 return on the basis of information that Mr. Durland provided to Mr. Gibbons.

[*38] M.    Boleyn Energy

On October 17, 2000, Mr. Durland and Ms. Fausett incorporated Boleyn Energy, Inc. (Boleyn Energy).  Ms. Fausett was the president of Boleyn Energy, and Mr. Durland was vice president, secretary, and treasurer.  Ms. Fausett and Mr. Durland each owned 750 shares of Boleyn Energy.  On October 19, 2000, Ms. Fausett assigned her interest in the Matagorda lease to Boleyn Energy.  After they incorporated Boleyn Energy, Mr. Durland told Ms. Fausett that he had deposited into an account at Merrill Lynch owned by Boleyn Energy (Boleyn Merrill Lynch) the funds from the Matagorda lease production checks that he had previously cashed.

III.    Events Occurring During 2001 and 2002

A.    2001 Cashier's Checks

In 2001 Mr. Durland purchased the following cashier's checks from Whitney National Bank with cash:

**[\*39]**

| Check No. | Date | Amount |
|---|---|---|
| 09016 | 1/16 | $30,000 |
| 09302 | 2/13 | 12,500 |
| 09902 | 4/17 | 5,000 |
| 09930 | 4/24 | 5,000 |
| 09959 | 5/3 | 4,000 |
| 10000 | 5/17 | 1,500 |
| Total | | 58,000 |

The payee on the 2001 cashier's checks was Gulfport Oil & Gas, and the remitter line on the checks indicated that the remitter was Mr. Durland and that they were for the payment of royalties on the Matagorda lease. Mr. Durland deposited the cashier's checks into a Merrill Lynch account owned by Gulfport Oil & Gas.

B.   Mr. Durland's and Mr. Harris' Assignment of Shares of Gulfport Oil & Gas Common Stock to Gulfport Oil & Gas

On January 15, 2001, Mr. Durland and Gulfport Oil & Gas entered into an agreement (Durland January 15, 2001, agreement) to exchange 573 of Mr. Durland's 1,170 shares of Gulfport Oil & Gas common stock for the following promissory notes payable to Gulfport Oil & Gas:

[*40]

| Date | Amount |
|---|---|
| 6/25/1999 | $20,000 |
| 7/16/1999 | 350,000 |
| 10/28/1999 | 65,000 |
| 12/31/2000 | [1]34,800 |
| Total | 469,800 |

[1]This promissory note is not in
the record.

Mr. Harris, on behalf of Gulfport Oil & Gas, and Mr. Durland signed the Durland January 15, 2001, agreement. In a document dated January 15, 2001, recorded on April 11, 2001, and signed by Mr. Harris on behalf of Gulfport Oil & Gas, Gulfport Oil & Gas released the November 3, 1999, deed of trust encumbering the 54th Street house. In undated documents signed by Mr. Harris on behalf of Gulfport Oil & Gas and witnessed by Mr. Durland and Ms. Fausett, Gulfport Oil & Gas acknowledged that the June 25, July 16, and October 28, 1999, promissory notes were paid in full.[15]

[15]Mr. Durland testified that he signed these acknowledgments around January 15, 2001. We do not find Mr. Durland's testimony to be credible. Instead we find credible Ms. Fausett's statement to the FBI in September 2000 that Mr. Durland had her prepare releases and acknowledgments of payments at the same time as he had her prepare the promissory notes for the purported loans.

[*41] On January 15, 2001, Mr. Harris and Gulfport Oil & Gas entered into an agreement (Harris January 15, 2001, agreement) pursuant to which Gulfport Oil & Gas and Mr. Harris agreed to exchange 896 of Mr. Harris' 1,830 shares of Gulfport Oil & Gas common stock for the following promissory notes:

| Date | Amount |
|---|---|
| 7/16/1999 | $335,000 |
| 7/16/1999 | 125,000 |
| 10/19/1999 | 75,000 |
| 12/31/2000 | [1]42,800 |
| Total | 577,800 |

[1]This promissory note is not in the record.

Mr. Durland, on behalf of Gulfport Oil & Gas, and Mr. Harris signed the Harris January 15, 2001, agreement. In a document dated January 15, 2001, recorded on April 11, 2001, and signed by Mr. Durland on behalf of Gulfport Oil & Gas, Gulfport Oil & Gas released the July 16, 1999, deed of trust encumbering Mr. and Mrs. Harris' home in Long Beach, Mississippi. After Mr. Durland and Mr. Harris respectively assigned 573 and 896 shares of their Gulfport Oil & Gas common stock to Gulfport Oil & Gas, Mr. Durland and Mr. Harris continued to own 39% and 61% of the outstanding Gulfport Oil & Gas common stock, respectively.

**[\*42]**        C.        Checks Issued to Boleyn Energy

Gulfport Oil & Gas issued the following checks to Boleyn Energy in 2001:

| Check No. | Date | Amount | Memo line |
|---|---|---|---|
| 1345 | 3/21 | $5,000 | "Repayment of loans to company" |
| 1359 | 3/21 | 40,000 | "Loan to company" |
| 1396 | 4/30 | 15,000 | "Net working interest payment for March 2001 Matagorda County, TX properties" |

Mr. Durland cashed these checks at Ferguson Check Cashing. Boleyn Energy reported the amount on check No. 1396 on its 2001 return, and petitioners reported that amount on a Schedule E attached to their 2001 return. Boleyn Energy did not report the amount on check No. 1345 or 1359 on its 2001 return, and petitioners did not report those amounts on their 2001 return.

        D.        Prytania Street House

In late 2000 or early 2001 Mr. Durland informed Ms. Fausett that he would not divorce her and that he would not give her the records he had promised her. He then directed her to look for a house to purchase in New Orleans, Louisiana, and he hired someone to take her around to look for one.

On April 22, 2001, Mr. Durland and Ms. Fausett signed a contract to purchase a house on Prytania Street in New Orleans, Louisiana (Prytania Street house), for $622,500. On May 31, 2001, Ms. Fausett closed on the Prytania Street

[*43] house, and it was titled in her name. Mr. Durland and Ms. Fausett paid for the Prytania Street house with a certified check from Merrill Lynch and $25,000 in cash. The certified check from Merrill Lynch was obtained with funds held in an account owned by Boleyn Energy. Those funds were--at least in part--from amounts paid to Mr. Durland, Ms. Fausett, or Boleyn Energy under the Matagorda lease.

On September 26, 2001, Ms. Fausett formed Trinity Art & Antiques, LLC (Trinity Art), to sell art and antiques. On a date that is unclear from the record Ms. Fausett transferred the Prytania Street house to Trinity Art. Later Trinity Art transferred the Prytania Street house back to Ms. Fausett so that she could obtain a loan on the property. After obtaining the loan Ms. Fausett transferred the Prytania Street house back to Trinity Art.

E.     <u>Hubbard Litigation</u>

In December 2000 ARXA changed its name to King Resources, Inc. (King Resources). On March 9, 2001, creditors of King Resources and Gulfport Oil & Gas sued King Resources, Gulfport Oil & Gas, Mr. Harris, and Mr. Durland in the U.S. District Court for the Southern District of Mississippi (Hubbard case or litigation). The plaintiffs in the Hubbard case claimed that King Resources and Gulfport Oil & Gas had failed to pay the plaintiffs amounts due on promissory

[*44] notes executed by ARXA and Gulfport Oil & Gas. In November 2002 Ms. Fausett was added as a defendant in the Hubbard case.

F.    Mr. Durland's Departure

In July 2001 Hawkins Ranch sent a letter to Gulfport Oil & Gas demanding overdue royalty payments on the Matagorda lease. On September 12, 2001, after Gulfport Oil & Gas failed to make the required payments, Hawkins Ranch terminated the lease.

Around September 2001 Mr. Durland stopped working for Mr. Harris and Gulfport Oil & Gas. By November 2001 Mr. Durland had moved into the Prytania Street house with Ms. Fausett and had stopped working altogether.

G.    2000 and 2001 Returns

In October 2001 Boleyn Energy filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for 2000 (2000 Boleyn Energy return), reporting that it elected to be taxed as an S corporation as of October 17, 2000. An accounting firm named GibbonsHall, LLC (GibbonsHall),[16] prepared the 2000 Boleyn Energy return, and Mr. Durland signed the return as an officer of Boleyn Energy.

---

[16]GibbonsHall's business address is the same as Gibbons, Gibbons & Buck's business address.

[*45] On October 17, 2001, Mr. Durland and Ms. Fausett filed a joint Form 1040 for 2000 (2000 return). On their 2000 return petitioners reported wages, taxable interest, Schedule E income, and total income of $25,000, $5,254, $133,482, and $204,238, respectively. On an attached Schedule E petitioners reported royalties, expenses, depreciation expense or depletion, and net income of $202,716, $40,000, $29,234, and $133,482, respectively. GibbonsHall prepared the 2000 return on the basis of information that Mr. Durland provided to Mr. Gibbons.

In September 2002 Boleyn Energy filed a Form 1120S for 2001 (2001 Boleyn Energy return). GibbonsHall prepared the 2001 Boleyn Energy return, and Mr. Durland signed the return as an officer of Boleyn Energy.

On September 3, 2002, Mr. Durland and Ms. Fausett filed a joint Form 1040 for 2001 (2001 return). On their 2001 return petitioners reported wages, taxable interest, Schedule E income, and total income of zero, $20,876, $275,430, and $292,852, respectively. On an attached Schedule E petitioners reported royalties, expenses, depreciation expense or depletion, and net income of $436,341, $67,816, $96,741, and $275,430, respectively. GibbonsHall prepared the 2001 return on the basis of information that Mr. Durland provided to Mr. Gibbons.

**[*46]** IV.    Events Occurring After 2002

A.    Saint Andrews Court House

In July 2003 Mr. Durland and Ms. Fausett moved into a house that Ms. Fausett purchased on Saint Andrews Court in Frisco, Texas (Saint Andrews Court house).  While she was living in Frisco Ms. Fausett sold antiques through a limited liability company she owned named Rosewood Ventures, LLC (Rosewood Ventures).

B.    2002-2007 Returns

Mr. Durland and Ms. Fausett filed joint Federal income tax returns for 2002 and 2003.  Mr. Gibbons prepared the joint returns.  Mr. Durland and Ms. Fausett filed separate Federal income tax returns for 2004-07.  An accounting firm in Dallas, Texas, prepared the separate returns.

C.    IRS' Investigation of Mr. Durland

On a date that is unclear from the record the FBI gave the IRS the information that Ms. Fausett had provided to its agents in 2000.  In March 2004 Special Agent Nancy Emmons and Revenue Agent Lisa Wansley met with Mr. Durland and Ms. Fausett.

On March 30, 2004, Special Agent Emmons and Special Agent Darren Mayer met with Mr. Harris.  During the March 30, 2004, meeting Mr. Harris

**[*47]** claimed that Mr. Durland had stolen $3 million and corporate records from Gulfport Oil & Gas but that he had not yet confronted him about the stolen money or records. On April 13, 2005, Special Agent Emmons and Revenue Agent Wansley met with Mr. Harris to review documents relating to Gulfport Oil & Gas and to ask him additional questions. During the April 13, 2005, meeting Mr. Harris stated that he had not seen, and did not have, currency transaction reports (CTRs) maintained by Ferguson Check Cashing and filed in his name even though the CTRs related to checks that Mr. Durland had cashed.[17]

> D.    Mr. Durland's Transfer of 1,500 Shares of Boleyn Energy
>       Common Stock to Rosewood Ventures

On a date that is unclear from the record Mr. Durland executed a bill of sale dated December 28, 2004, that purported to transfer 1,500 shares of common stock

---

[17]Mr. Harris also testified that he had not sent Jonathan Harris to retrieve the CTRs from Ferguson Check Cashing and that neither Jonathan Harris nor Ms. Ferguson had given him any CTRs. We do not find Mr. Harris' statement or testimony to be credible because Jonathan Harris credibly testified that he retrieved copies of the CTRs from Ferguson Check Cashing, and we find it implausible that he would have done this on his own or that Mr. Harris did not see the CTRs that Jonathan Harris retrieved.

[*48] in Boleyn Energy from himself to Rosewood Ventures.[18] Mr. Durland

signed the bill of sale as a witness.

    E.    Mr. Durland's Indictment for Tax Evasion

On June 21, 2006, the United States filed a criminal indictment against Mr.

Durland with the U.S. District Court for the Southern District of Mississippi. The

indictment charged Mr. Durland with two counts of violating section 7201 with

respect to his 1999 and 2000 Federal income tax liabilities, respectively. With

respect to 2000 the indictment stated as follows:

COUNT 2

> On or about October 2, 2001, in Harrison County, in the
> Southern Division of the Southern District of Mississippi, the
> defendant, JACK R. DURLAND, JR., who was a resident of
> Gulfport, Mississippi, did willfully attempt to evade and defeat a
> large part of the income tax due and owing by he and his spouse to
> the United States of America for the calendar year 2000, by preparing
> and causing to be prepared, and by signing and causing to be signed,
> a false and fraudulent joint U.S. Individual Income Tax Return, Form
> 1040, on behalf of themselves, which was filed with the Internal
> Revenue Service, wherein it was stated that their joint taxable income
> for said calendar year was the sum of $201,164, and that the amount

---

[18]The parties stipulated that Mr. Durland transferred 1,500 shares of Boleyn Energy common stock to Rosewood Ventures on December 28, 2004. However, we do not find this stipulation to be credible because the date on the bill of sale appears to have been altered and Mr. Durland owned only 750 shares of Boleyn Energy common stock. We therefore disregard the stipulation as inconsistent with a stipulated exhibit in the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195.

**[*49]** of tax due and owing thereon was the sum of $56,465, whereas, as he then and there well knew and believed, their joint taxable income for the said calendar year was substantially in excess of that heretofore stated and that upon said additional taxable income a substantial additional tax was due and owing to the United States of America.

In violation of Title 26, United States Code, Section 7201.

F.    Mr. Durland's Plea Agreement

In a letter to Mr. Durland's attorneys dated February 28, 2007, for the purpose of calculating Mr. Durland's sentence under the Federal sentencing guidelines for the count relating to 1999, the U.S. Attorney's Office for the Southern District of Mississippi proposed not to include in his income $435,000 in purported loans from Gulfport Oil & Gas. Additionally, for the purpose of calculating Mr. Durland's sentence under the Federal sentencing guidelines for the count relating to 2000, the U.S. Attorney's Office proposed not to include the $12,500 check payable to T.J. Oil & Gas, $163,751 in Investec checks, and $327,000 in individual investor checks; and to include only 39% of the $921,989 proceeds from Eagle Energy production checks.[19] Additionally, the U.S. Attorney's Office proposed not to seek an abuse of trust enhancement on the

---

[19]The evidence presented at trial indicated that the individual investor checks total $327,200. After rounding to the nearest dollar, the Court finds that the proceeds from Eagle Energy total $921,988, and the Investec checks total $163,752.

**[*50]** theory that Mr. Durland embezzled the unreported income from Gulfport Oil & Gas.

On April 12, 2007, Mr. Durland entered into a plea agreement with the U.S. Attorney's Office in which he agreed to plead guilty to count 2 of the June 21, 2006, indictment. Pursuant to the plea agreement, the U.S. Attorney's Office agreed, among other things, to move to dismiss the open count; to stipulate that the tax loss for 2000 is $115,557; and to not further prosecute Mr. Durland or Ms. Fausett for events relating to their 1999-2001 tax years. The plea agreement stated as follows:

> 8. <u>Binding Effect On This District Only</u>. It is further understood that this plea agreement does not bind any state or local prosecuting authorities or any other federal district except as to the use of Defendant's statements voluntarily given hereunder; further, this agreement does not bind the Attorney General of the United States in regard to any civil matter involving the tax statutes of the United States.
>
> \* \* \* \* \* \* \*
>
> 13. <u>Complete Agreement</u>. It is further understood that this plea agreement completely reflects all promises, agreements and conditions made by and between the United States Attorney's Office for the Southern District of Mississippi and Defendant.

On July 27, 2007, the U.S. District Court for the Southern District of Mississippi accepted a guilty plea as to count 2, and dismissed count 1, of the June

[*51] 21, 2006, indictment. The court sentenced Mr. Durland to a term of imprisonment of 11 months and supervised release of 3 years and required him to pay an assessment of $100, a fine of $30,000, and restitution of $97,475. Mr. Durland was imprisoned in a Federal prison camp in Pensacola, Florida, from August 2007 until June 2008.[20]

### G. 2007 Oklahoma Divorce Case

On November 15, 2007, Ms. Fausett filed for divorce from Mr. Durland in the District Court of Oklahoma County, Oklahoma (2007 Oklahoma divorce case). On March 2, 2009, the court in the 2007 Oklahoma divorce case dissolved petitioners' marriage. The divorce decree states that both Mr. Durland and Ms. Fausett are liable for the tax for the years at issue.

## V. Deficiency Notices

On September 28, 2010, respondent issued duplicate original notices of deficiency to Mr. Durland and Ms. Fausett. In an attached Form 886-A, Explanation of Adjustments, respondent determined that the following amounts

---

[20]Respondent introduced into evidence several letters that Mr. Durland wrote to Ms. Fausett while he was incarcerated. Mr. Durland objected to the introduction of these letters on the basis of the marital communications privilege. At trial we reserved ruling on Mr. Durland's objection, and by order we overruled Mr. Durland's objection and admitted the letters into evidence. We note, however, that the parties did not rely on any of those letters in their posttrial briefs, and we likewise do not base any of our findings of fact on the contents of those letters.

[*52] represented diverted corporate income to Mr. Durland and/or Ms. Fausett for 1999-2001:

| Entity or source | 1999 | 2000 | 2001 |
|---|---|---|---|
| T.J. Oil & Gas | $55,000 | $17,500 | -0- |
| Gulfport Oil & Gas | 435,000 | 122,500 | $45,000 |
| Eagle Energy | -0- | 921,988 | -0- |
| Investec | -0- | 163,752 | -0- |
| Individual investors | -0- | 327,200 | -0- |
| Total | 490,000 | 1,552,940 | 45,000 |

Respondent also determined that Mr. Durland and Ms. Fausett were entitled to additional Schedule E deductions of $144,548 for 2000[21] and that Mr. Durland was liable for civil fraud penalties with respect to the entire underpayment of tax for 1999, 2000, and 2001.

## OPINION

I.   Preliminary Matters

   A.   Credibility of Witnesses and Reliability of Documentary Evidence

   In Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 84 (2000) (citing Boehm v. Commissioner, 326 U.S. 287, 293 (1945), and Wilmington Tr.

---

[21]In a document dated June 14, 2005, Revenue Agent Wansley determined that petitioners substantiated royalty payments of $30,000 deducted on the Schedule E attached to their 2000 return and that they were entitled to claim further Schedule E deductions of $144,548 relating to Whitney National Bank cashier's check Nos. 08945, 08637, 08676, 08690, and 08807.

**[*53]** <u>Co. v. Helvering</u>, 316 U.S. 164, 167-168 (1942)), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002), we stated as follows:

> Before turning to the issues at hand, we pause to pass on our perception of the trial witnesses [and the reliability of much of the documentary evidence]. We observe the candor, sincerity, and demeanor of each witness in order to evaluate his or her testimony and assign it weight for the primary purpose of finding disputed facts. We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. The mere fact that one party presents unopposed testimony [or other evidence] on his or her behalf does not necessarily mean that the elicited testimony [or other evidence] will result in a finding of fact in that party's favor. We will not accept the testimony of witnesses at face value if we find that the outward appearance of the facts in their totality conveys an impression contrary to the spoken word. * * *

The Court's statement in <u>Neonatology Assocs.</u> is particularly apt here. The parties called several witnesses to testify and introduced numerous documents. Unless we otherwise herein expressly find, we did not find the testimony of Mr. Durland, Ms. Fausett, Mr. Harris, or Ms. Richardson to be credible. Additionally, we have little confidence in the genuineness or accuracy of many of the documents that Mr. Durland drafted, maintained, or subscribed.

### B.    Judicial Estoppel

Under the doctrine of judicial estoppel, a party that wins judicial acceptance of a theory in one case cannot pursue a contradictory theory in a later case. <u>See</u>

**[\*54]** New Hampshire v. Maine, 532 U.S. 742, 749 (2001); Fazi v. Commissioner, 105 T.C. 436, 445 (1995) (citing Huddleston v. Commissioner, 100 T.C. 17, 28-29 (1993)).  Judicial estoppel is an equitable principle the purpose of which is to "protect the integrity of the judicial process * * * by prohibiting parties from deliberately changing positions according to the exigencies of the moment".  New Hampshire v. Maine, 532 U.S. at 749-750 (first quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982), then quoting United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993)).  "[J]udicial estoppel does not bar a party from contradicting itself, but from contradicting a court's determination that was based on that party's position."  Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1217 n.3 (6th Cir. 1990).

Mr. Durland contends that respondent should be barred, under the doctrine of judicial estoppel, from asserting a deficiency greater than the tax loss that the sentencing court in his criminal case relied on to determine his restitution obligation for 2000.  In particular Mr. Durland asserts that the tax loss that the sentencing court relied on was based upon certain concessions that the U.S. attorney proposed to make in the February 28, 2007, letter to his attorneys.  This contention is without merit because respondent has not asked this Court to accept

**[\*55]** a position contrary to one that the Government successfully asked the court in Mr. Durland's criminal case to accept.

    C.    <u>Mr. Durland's Plea Agreement</u>

Mr. Durland contends respondent should be bound by the terms of his plea agreement--under which the count relating to 1999 was dismissed and the Government agreed not to further prosecute Mr. Durland and Ms. Fausett for 1999-2001--and by certain representations that the U.S. Attorney's Office purportedly made to him that were not memorialized in the plea agreement. These contentions, however, are without merit. Mr. Durland's plea agreement expressly stated that the Government was not barred from pursuing any civil tax matter and that it contains the entire agreement between the U.S. Attorney's Office for the Southern District of Mississippi and Mr. Durland.

Similarly, Mr. Durland's contention that the doctrine of equitable estoppel should bar respondent from asserting the deficiencies at issue is without merit. An appeal in these cases would lie, absent a stipulation to the contrary, in the U.S. Court of Appeals for the Tenth Circuit. <u>See</u> sec. 7482(b)(1)(A), (2). That court has held that

> [t]o state a claim of estoppel against a private party, a litigant must establish four elements: "(1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct will be

**[*56]** acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury."

Rios v. Ziglar, 398 F.3d 1201, 1208 (10th Cir. 2005) (quoting Kowalczyk, 245 F.3d 1143, 1149 (10th Cir. 2001)). "A claim of estoppel against the [G]overnment requires an additional element: the party asserting estoppel must show that the [G]overnment has engaged in 'affirmative misconduct.'" Id. (citing Kowalczyk, 245 F.3d at 1149).

Mr. Durland's plea agreement expressly stated that the Government was not barred from pursuing any civil tax matter and disclaimed any extrinsic agreements. Mr. Durland has presented no credible evidence that he was misled in any way. Accordingly, respondent is not barred from asserting the deficiencies at issue.

II.     Period of Limitations on Assessment

Generally, pursuant to section 6501(a), the amount of any tax must be assessed within three years of the filing of a return. Section 6501(c)(1), however, provides that "[i]n the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." The determination of fraud for purposes of section 6501(c)(1) is the same as the determination of fraud for the purposes of the penalty under section 6663. Neely v. Commissioner, 116 T.C. 79,

**[\*57]** 85 (2001). In the case of income tax deficiencies on joint returns, proof of fraud against either spouse prevents the running of the period of limitations as to both spouses. <u>Vannaman v. Commissioner</u>, 54 T.C. 1011, 1018 (1970).

The statute of limitations is an affirmative defense, and the party asserting it must specifically plead it and carry the burden of showing its applicability. <u>See</u> Rules 39, 142(a); <u>Robinson v. Commissioner</u>, 117 T.C. 308, 312 (2001); <u>Adler v. Commissioner</u>, 85 T.C. 535, 540 (1985). Petitioners properly pleaded the statute of limitations as a defense in their respective petitions, and the burden of proof for this issue is on them. However, respondent bears the burden of proving that an exception to the general three-year period of limitations applies. <u>See</u> <u>Harlan v. Commissioner</u>, 116 T.C. 31, 39 (2001) (citing <u>Reis v. Commissioner</u>, 142 F.2d 900 (6th Cir. 1944), <u>aff'g</u> 1 T.C. 9 (1942)); <u>Bardwell v. Commissioner</u>, 38 T.C. 84, 92 (1962), <u>aff'd</u>, 318 F.2d 786 (10th Cir. 1963). Additionally, to the extent that respondent relies on the doctrine of collateral estoppel to preclude Mr. Durland's arguing that the 2000 return was not fraudulent, the burden of proof is on respondent. <u>See</u> Rules 39, 142(a).

Mr. Durland is precluded by the doctrine of collateral estoppel from arguing that the 2000 return was not fraudulent. <u>See</u> <u>infra</u> part IV.B.1. Respondent concedes, however, that Ms. Fausett is not precluded from arguing that the 2000

**[\*58]** return was not fraudulent because she was not a party to Mr. Durland's plea agreement. See Vannaman v. Commissioner, 54 T.C. at 1018. We will therefore determine on the basis of the evidence in these cases whether the 1999-2001 returns were fraudulent.

Because we conclude below that the 1999-2001 returns were fraudulent, see infra part IV.B.3, respondent has met his burden of showing that an exception to the general three-year period of limitation applies, see sec. 6501(c)(1); Neely v. Commissioner, 116 T.C. at 85; Vannaman v. Commissioner, 54 T.C. at 1018. Accordingly, petitioners' statute of limitations defense fails.

III.    Unreported Income Adjustments

    A.    Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, if a taxpayer produces credible evidence[22] with respect to any factual issue relevant to ascertaining the taxpayer's liability for any tax imposed by

---

[22]"Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

**[*59]** subtitle A or B of the Code and satisfies the requirements of section

7491(a)(2),[23] the burden of proof on any such issue shifts to the Commissioner.

See sec. 7491(a)(1).

With respect to some of the factual issues in these cases petitioners have

failed to introduce credible evidence. We decide the remainder on the

preponderance of the evidence. Because we can decide all of the issues in these

cases without regard to the ultimate allocation of the burden of proof under section

7491(a)(1), we need not decide whether petitioners satisfied the requirements of

section 7491(a)(2). See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir.

2005), aff'g T.C. Memo. 2003-212; Knudsen v. Commissioner, 131 T.C. 185, 188-

189 (2008).

In unreported income cases the U.S. Court of Appeals for the Tenth Circuit

has held that the presumption of correctness does not attach until the

Commissioner has produced some substantive evidence demonstrating that the

taxpayer received the unreported income. See United States v. McMullin, 948

_____

[23]Sec. 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews. See also Higbee v. Commissioner, 116 T.C. at 440-441. The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

**[\*60]** F.2d 1188, 1192 (10th Cir. 1991); <u>Erickson v. Commissioner</u>, 937 F.2d 1548, 1551 (10th Cir. 1991), <u>aff'g</u> T.C. Memo. 1989-552. The parties have stipulated that Mr. Durland received the amounts that respondent determined to be income to him for the years at issue and that these amounts were not reported on Mr. Durland and Ms. Fausett's 1999-2001 returns. Petitioners, to be sure, dispute respondent's determination that these amounts were income to Mr. Durland. However, the stipulations are sufficient to allow the presumption of correctness to attach to respondent's determination. See <u>McMullin</u>, 948 F.2d at 1192; <u>Erickson v. Commissioner</u>, 937 F.2d at 1551.

B.    <u>Specific-Item Method</u>

A taxpayer must maintain books and records establishing the amount of his or her gross income. <u>See</u> sec. 6001. If a taxpayer fails to maintain and produce the required books and records, the Commissioner may determine the taxpayer's income by any method that clearly reflects income. <u>See</u> sec. 446(b); <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances." <u>Petzoldt v. Commissioner</u>, 92 T.C. at 687. The specific-item method is an indirect method of income reconstruction that consists of evidence of specific amounts of income received by a taxpayer and not

[*61] reported on the taxpayer's return.  See Estate of Beck v. Commissioner, 56 T.C. 297, 353, 361 (1971).

Mr. Durland failed to maintain accurate books and records for the years at issue.  Respondent was therefore justified in using the specific-item method to determine petitioners' tax liabilities for the years at issue.  See id. at 353-354.

C.      The Parties' Arguments

Respondent generally asserts that the unreported income that he determined comprises Mr. Durland's wages and diverted income from Gulfport Oil & Gas that petitioners should have reported on their returns.  Petitioners argue that (1) any amounts Mr. Durland received and retained were nontaxable loans and (2) he gave substantial amounts of the allegedly diverted income to Mr. Harris.

Gross income includes "all income from whatever source derived".  Sec. 61(a).  This includes compensation for services, such as wages, salaries, and bonuses, see sec. 61(a)(1), "wrongful appropriations", James v. United States, 366 U.S. 213, 219 (1961), and dividends, see sec. 61(a)(7).

To the extent that petitioners contend that any of the specific items at issue were loans, they must show that the underlying transactions created bona fide indebtedness.  "Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon a consideration of all the pertinent facts in

[*62] the case." Fisher v. Commissioner, 54 T.C. 905, 909 (1970). Factors

indicative of a bona fide debt include whether: (1) evidence of indebtedness

exists; (2) any security is requested; (3) there has been a demand for repayment;

(4) the parties' records reflect the transaction as a loan; (5) any payments have

been made; and (6) any interest was charged. See, e.g., Alpert v. Commissioner,

T.C. Memo. 2014-70, at *20 (citing Sundby v. Commissioner, T.C. Memo. 2003-

204). The key question is: "Was there a genuine intention to create a debt, with a

reasonable expectation of repayment, and did that intention comport with the

economic reality of creating a debtor-creditor relationship?" Litton Bus. Sys., Inc.

v. Commissioner, 61 T.C. 367, 377 (1973).

D.     Specific Items at Issue for 1999

Respondent determined that petitioners failed to report on their 1999 return

(1) salary checks totaling $55,000 that T.J. Oil & Gas paid to Mr. Durland and (2)

fictitious loans totaling $435,000 that Gulfport Oil & Gas paid to Mr. Durland.

1.     T.J. Oil & Gas Salary Checks Totaling $55,000

Mr. Harris owned T.J. Oil & Gas. Mr. Durland signed an employment

contract with Covington Energy, another entity owned by Mr. Harris, in December

1998 and with Gulfport Oil & Gas in 1999. His various employment contracts

called for a monthly salary of $10,000. The checks from T.J. Oil & Gas were in

[*63] amounts of around $10,000 per month, and the memo line on several of the checks indicated that the purpose of the checks was to pay salary to Mr. Durland. Mr. Durland performed services for T.J. Oil & Gas and several other entities in 1999, but petitioners reported receiving wages of only $25,000 on their 1999 return. Although Mr. Durland executed a backdated $55,000 promissory note, petitioners introduced no credible evidence showing that any payments were ever made on the promissory note he executed or on a similar one executed by Jonathan Harris. Indeed, Jonathan Harris credibly testified that the $23,000 amount on the promissory note he executed was his salary and that he signed it only because Mr. Durland told him that he otherwise would not be paid. We conclude that Mr. Durland received wages of $55,000 from T.J. Oil & Gas that he failed to report on petitioners' 1999 return.

## 2. Purported Loans Totaling $435,000

Although Mr. Durland and Ms. Fausett executed promissory notes of $20,000, $350,000, and $65,000 dated June 25, July 16, and October 28, 1999, respectively, petitioners introduced no credible evidence showing that they made any of the payments required under those notes. Additionally, Ms. Fausett stated to the FBI that she signed the July 16, 1999, promissory note on November 14, 1999, and the UCC-01 financing statements with respect to the promissory notes

[*64] dated June 25 and October 28, 1999, were not filed until August 16, 2000, when it was in Mr. Durland's interest to do so in the 2000 divorce proceedings.

Petitioners contend that Mr. Durland repaid the $435,000 in purported loans by transferring 573 shares of his Gulfport Oil & Gas common stock to Gulfport Oil & Gas in the Durland January, 15, 2001, agreement. However, the Durland January 15, 2001, agreement was executed on the same date as the Harris January 15, 2001, agreement; and after both agreements were executed, Mr. Durland and Mr. Harris still owned 39% and 61%, respectively, of the common stock issued by Gulfport Oil & Gas. Because the January 15, 2001, agreements did not affect Mr. Durland's and Mr. Harris' ownership interests in Gulfport Oil & Gas, the agreements did not effect a transfer of anything of value from Mr. Durland and Mr. Harris to Gulfport Oil & Gas. We therefore conclude that Mr. Durland never repaid--and never intended to repay--the $435,000 in purported loans.

However, we also do not accept respondent's contention that Mr. Durland embezzled the $435,000 because (1) Jonathan Harris and Mr. Harris signed the checks that Gulfport Oil & Gas issued to Mr. Durland in connection with the $435,000 in purported loans; (2) Mr. Harris signed the Durland January 15, 2001, agreement that purported to document the repayment of the $435,000 in fictitious loans, and (3) Mr. Harris himself, through Mrs. Harris, received at least $535,000

[*65] in fictitious loans from Gulfport Oil & Gas in 1999 and engaged in the same meaningless transaction as Mr. Durland did to "repay" the loans. Instead, we conclude that the $435,000 was corporate income diverted from Gulfport Oil & Gas to Mr. Durland. Petitioners have introduced no credible evidence showing that the income was not taxable in whole or in part.[24] We therefore sustain respondent's determination that the $435,000 is includible in Mr. Durland's gross income for 1999.

E.  Specific Items at Issue for 2000

Respondent determined that petitioners failed to report on their 2000 return (1) a check for $5,000 that T.J. Oil & Gas issued to Mr. Durland; (2) salary checks totaling $122,500 that Gulfport Oil & Gas issued to Mr. Durland; and (3) checks totaling $1,425,440 payable to T.J. Oil & Gas or Gulfport Oil & Gas that Mr. Durland cashed at Ferguson Check Cashing.[25] Mr. Durland appears to contend

---

[24]Mr. Durland failed to prove that Gulfport Oil & Gas had any earnings and profits or that he had any basis in his ownership interest of Gulfport Oil & Gas. Mr. Durland therefore failed to prove that any part of the diverted corporate income was not taxable. See sec. 301; Truesdell v. Commissioner, 89 T.C. 1280, 1295-1296 (1987).

[25]These include a check payable to T.J. Oil & Gas for $12,500; individual investor checks payable to Gulfport Oil & Gas totaling $327,200; Investec checks payable to Gulfport Oil & Gas totaling $163,752; and production checks payable to Gulfport Oil & Gas totaling $921,988.

[*66] that he is entitled to additional deductions for cashier's checks that he bought with cash and deposited into an account of Gulfport Oil & Gas.

### 1. T.J. Oil & Gas Check for $5,000

Mr. Durland performed services for T.J. Oil & Gas and several other entities in 2000, but on petitioners' 2000 return he reported receiving wages of only $25,000. He did not include a $5,000 check that T.J. Oil & Gas issued to him as wages and that had an entry on the memo line showing the payment as a loan from the corporation. We do not find the entry on the memo line of the check to be credible. Petitioners introduced no credible evidence showing that Mr. Durland ever repaid this purported loan or that any promissory note was executed for it. Finally, the $5,000 check is similar in amount to the checks that we found to be salary to Mr. Durland in 1999. See supra part III.D.1. We conclude that Mr. Durland received a wage payment of $5,000 from T.J. Oil & Gas that he failed to report on petitioners' 2000 return.

### 2. Gulfport Oil & Gas Salary Checks Totaling $122,500

Mr. Durland testified that he admitted to the U.S. attorney that the $122,500 was income to him for 2000, and this testimony is consistent with the evidence. Mr. Durland's employment contract with Gulfport Oil & Gas called for a monthly salary of $10,000. Mr. Durland performed services for Gulfport Oil & Gas and

[*67] several other entities in 2000, but he reported receiving wages of only $25,000 on petitioners' 2000 return. Petitioners introduced no credible evidence showing that Mr. Durland ever repaid or made these purported loans or that any promissory notes were ever executed for them. Although the memo line on the checks stated that the amounts on the checks were for loans from the corporation or repayment of loans to the corporation, we do not find these entries to be credible. Finally, the amounts on the checks are for the most part similar in amounts to the checks that we found to be salary to Mr. Durland in 1999. See supra part III.D.1. We conclude that Mr. Durland received wage payments of $122,500 from Gulfport Oil & Gas that he failed to report on petitioners' 2000 return.

### 3. Checks Payable to T.J. Oil & Gas and Gulfport Oil & Gas

Mr. Durland testified that he gave all of the cash that he received from cashing the checks payable to T.J. Oil & Gas and Gulfport Oil & Gas at Ferguson Check Cashing to Mr. Harris. We do not find Mr. Durland's testimony on this point to be entirely credible. Mr. Durland and Mr. Harris repeatedly diverted gross receipts of Gulfport Oil & Gas to themselves and their nominees (seemingly, to defraud its creditors and investors). We so find.

**[*68]** Mr. Harris testified that Mr. Durland never gave him any of the money. We do not find Mr. Harris' testimony to be credible. He repeatedly claimed to not remember important facts, and his demeanor suggested that his testimony was generally untruthful. He falsely testified that he did not send Jonathan Harris to retrieve the CTRs filed in his name from Ferguson Check Cashing, and he falsely told the IRS that he had not seen the CTRs. Additionally, the record demonstrates that Mr. Harris engaged in the same tax evasion tactics as those employed by Mr. Durland during the years in issue. In short, Mr. Harris was not a credible witness.

Not only was Mr. Harris not a credible witness, but his testimony struck us as entirely implausible. In particular we find it remarkable that, although Mr. Harris had ownership interests of 100% and 61% in T.J. Oil & Gas and Gulfport Oil & Gas, respectively, neither he nor Jonathan Harris made any attempt to recover Mr. Harris' share of the $12,500 and $1,412,940 that Mr. Durland allegedly diverted from T.J. Oil & Gas and Gulfport Oil & Gas, respectively, in 2000. Additionally, before Mr. Durland started cashing the production checks from Eagle Energy, Gulfport Oil & Gas had been making payments to Mrs. Harris and Ms. Fausett in amounts that were exactly proportional to Mr. Harris' and Mr. Durland's respective ownership interests in it, and Mr. Harris and Mr. Durland both received fictitious loans from Gulfport Oil & Gas in 1999. We infer from

[*69] this and find that Mr. Harris and Mr. Durland both received portions of the proceeds in accordance with their ownership interests: Mr. Harris had a 61% ownership interest and Mr. Durland a 39% ownership interest. We conclude that Mr. Durland actually received 39% of the $1,425,440 in checks payable to T.J. Oil & Gas or Gulfport Oil & Gas in 2000, or $555,922.[26]

We further conclude that the $555,922 that Mr. Durland actually received was corporate income diverted from Gulfport Oil & Gas to Mr. Durland. Petitioners have introduced no credible evidence showing that the diverted corporate income was not taxable. Accordingly, the $555,922 is includible in Mr. Durland's gross income for 2000.

4.    Cashier's Checks

Mr. Durland introduced copies of cashier's checks that he bought with cash and deposited into an account of Gulfport Oil & Gas in 2000. However, respondent already allowed additional Schedule E deductions of $144,548 for the excess of these checks over the Schedule E deductions that petitioners claimed on their 2000 return. Accordingly, no further adjustments are warranted.

---

[26]Because the check payable to T.J. Oil & Gas was drawn on an account of Gulfport Oil & Gas, we infer that Mr. Durland received his share of that check too.

**[\*70]** F.    Specific Items at Issue for 2001

Respondent determined that petitioners failed to report on their 2001 return checks totaling $45,000 payable to Boleyn Energy from Gulfport Oil & Gas. Respondent did not allow any additional Schedule E deductions for cashier's checks that Mr. Durland bought with cash and deposited into an account of Gulfport Oil & Gas during 2001.

Mr. Durland performed services for Gulfport Oil & Gas and several other entities in 2001, but he did not report receiving any wages on petitioners' 2001 return.  Petitioners introduced no credible evidence showing that Mr. Durland made loans to or received loans from any entity in these amounts or that Mr. Durland executed promissory notes for these amounts.  We conclude that the $45,000 was compensation to him for the services that he provided.  Although the payee on the checks was Boleyn Energy, the $45,000 was wage income to him that he failed to report on petitioners' 2001 return.

Mr. Durland introduced copies of cashier's checks that he bought with cash and deposited into an account of Gulfport Oil & Gas in 2001.  The amounts on the cashier's checks total $58,000.  However, that amount is less than the amount petitioners claimed as Schedule E expense deductions on their 2001 return.

**[\*71]** Accordingly, no adjustment to the Schedule E expense deductions that petitioners claimed on their 2001 return is warranted.

## IV. Civil Fraud Penalties

### A. Section 6663(a) Generally

Section 6663(a) provides: "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." The Commissioner bears the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To satisfy that burden, the Commissioner must show: (1) an underpayment exists and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Sadler v. Commissioner, 113 T.C. 99, 102 (1999).

The Commissioner is not required to establish the precise amount of the deficiency to prove an underpayment. See DiLeo v. Commissioner, 96 T.C. 858, 886 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). However, he cannot discharge his burden by simply relying on the taxpayer's failure to prove error in his determination of the deficiency. See id. (citing Otsuki v. Commissioner, 53 T.C. 96, 106 (1969), and Pigman v. Commissioner, 31 T.C. 356, 370 (1958)). Once the

[*72] Commissioner establishes an underpayment by clear and convincing evidence, the deficiency determination enjoys its usual presumption of correctness. See id. (citing Compton v. Commissioner, T.C. Memo. 1983-642, and Cleveland v. Commissioner, T.C. Memo. 1983-299).

Any conduct likely to mislead or conceal may constitute an affirmative act of evasion, and an intent to mislead may be inferred from a pattern of such conduct. See Spies v. United States, 317 U.S. 492, 499 (1943). Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956). If the Commissioner establishes that some portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud. See sec. 6663(b).

Because fraudulent intent may be difficult to prove by direct evidence, the Commissioner may establish fraud by circumstantial evidence. See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; DiLeo v. Commissioner, 96 T.C. at 875. Courts have developed a nonexclusive list of factors--often referred to as badges of fraud--that demonstrate fraudulent intent. Those badges include: (1) understating income; (2) failing to maintain

**[*73]** adequate records; (3) offering implausible or inconsistent explanations; (4) concealing income or assets; (5) providing incomplete or misleading information to the taxpayer's tax return preparer; (6) offering false or incredible testimony; (7) filing false documents, including filing false income tax returns; and (8) engaging in extensive dealings in cash.  See Bradford v. Commissioner, 796 F.2d at 307-308; Parks v. Commissioner, 94 T.C. 654, 664-665 (1990); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Lipsitz v. Commissioner, 21 T.C. 917, 937 (1954), aff'd, 220 F.2d 871 (4th Cir. 1955); Morse v. Commissioner, T.C. Memo. 2003-332, slip op. at 8, aff'd, 419 F.3d 829 (8th Cir. 2005).  The existence of any one factor is not dispositive, but the existence of several factors is persuasive circumstantial evidence of fraud.  See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Petzoldt v. Commissioner, 92 T.C. at 700.

      B.     Whether Mr. Durland Is Liable for the Civil Fraud Penalties

          1.     Collateral Estoppel

Under the doctrine of collateral estoppel, once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979).  Collateral estoppel is a judicially created equitable

**[\*74]** principle the purposes of which are to protect the parties from unnecessary and redundant litigation, to conserve judicial resources, and to foster certainty in and reliance on judicial action. Id. at 153-154.

Before we may apply collateral estoppel in the context of a factual dispute, the following five conditions must be satisfied: (1) the issue in the second suit must be identical in all respects with the issue decided in the first suit; (2) the issue in the first suit must have been the subject of a final judgment entered by a court of competent jurisdiction; (3) the person against whom collateral estoppel is asserted must have been a party or in privity with a party in the first suit; (4) the parties must actually have litigated the issue in the first suit and resolution of the issue must have been essential to the prior decision; and (5) the controlling facts and applicable legal principles must remain unchanged from those in the first suit. See Bussell v. Commissioner, 130 T.C. 222, 239-240 (2008); Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), aff'd, 904 F.2d 525 (9th Cir. 1990).

Mr. Durland pleaded guilty to tax evasion under section 7201 for 2000. A conviction for tax evasion pursuant to section 7201, either upon a guilty plea or upon a jury verdict, conclusively establishes the existence of fraud in a subsequent proceeding through the doctrine of collateral estoppel. See DiLeo v. Commissioner, 96 T.C. at 885. It also conclusively establishes liability for the

[*75] civil fraud penalty under section 6663(a) because the elements of criminal tax evasion under section 7201 and civil fraud under section 6663(a) are virtually identical.  See Anderson v. Commissioner, 698 F.3d 160, 164 (3d Cir. 2012), aff'g T.C. Memo. 2009-44.  Accordingly, Mr. Durland is precluded by the doctrine of collateral estoppel from arguing that the 2000 return is not fraudulent or that he is not liable for a civil fraud penalty under section 6663(a) for 2000.  He therefore bears the burden of establishing the portion, if any, of the underpayment for 2000 that is not due to fraud.  See sec. 6663(b).  However, as explained above, see supra part II, respondent cannot rely on the doctrine of collateral estoppel for the purpose of proving that the fraud exception to the general three-year period of limitations applies with respect to Ms. Fausett.[27]  Accordingly, we will determine whether Mr. Durland is liable for the section 6663(a) penalty for all of the years in issue--and therefore whether the 1999-2001 returns were fraudulent--without reliance on the doctrine of collateral estoppel.

---

[27]However, even as with respect to Ms. Fausett, Mr. Durland's guilty plea can be--and is--clear and convincing evidence that he intended to evade a tax due and owing for 2000.  See Norris v. Commissioner, T.C. Memo. 2011-161, 102 T.C.M. (CCH) 26, 31 (2011).

**[\*76]**      2.      <u>Underpayment of Tax</u>

Respondent has proven by clear and convincing evidence that Mr. Durland failed to report income for each of the years in issue.  <u>See</u> <u>supra</u> part III.D-F.  Accordingly, respondent has met his burden of proving by clear and convincing evidence that an underpayment exists for each of the years in issue.  <u>See</u> <u>DiLeo v. Commissioner</u>, 96 T.C. at 886 (citing <u>Compton v. Commissioner</u>, T.C. Memo. 1983-642, and <u>Cleveland v. Commissioner</u>, T.C. Memo. 1983-299).

3.      <u>Fraudulent Intent</u>

a.      <u>Understating Income</u>

A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the reason for the understatements is not satisfactorily explained or is not due to innocent mistake.  <u>See</u> <u>Holland v. United States</u>, 348 U.S. 121, 137-139 (1954); <u>Spies</u>, 317 U.S. at 499.  On the basis of clear and convincing evidence we determined that Mr. Durland failed to report substantial income for each of the years in issue.  This failure appears to be deliberate because Mr. Durland took affirmative steps to hide his receipt of this income.  These steps include executing bogus promissory notes, causing Gulfport Oil & Gas to state on the memo lines of checks that it issued to him that the checks

**[*77]** were for loans that never existed, and cashing checks at Ferguson Check Cashing. Accordingly, this factor favors a finding of fraud for 1999-2001.

### b. Failing To Maintain Adequate Records

Because Mr. Durland failed to maintain accurate books and records during the years in issue, respondent had to resort to the specific-item method to reconstruct Mr. Durland's income for the years in issue. Accordingly, this factor favors a finding of fraud for 1999-2001.

### c. Offering Implausible or Inconsistent Explanations

Mr. Durland's testimony and statements to the IRS in which he testified and stated that certain salary checks issued to him in 1999-2001 were for loans from various entities to him or for repayments of loans he made to the entities are implausible. Accordingly, this factor favors a finding of fraud for 1999-2001.

### d. Concealing Assets or Income

An intent to evade tax may be inferred from "concealment of assets or covering up sources of income". Spies, 317 U.S. at 499; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971), aff'g T.C. Memo. 1969-48. Mr. Durland concealed his 1999 income by drafting bogus promissory notes and by cashing his salary checks at Ferguson Check Cashing; he concealed his 2000 income by causing Gulfport Oil & Gas to include false statements on the memo lines of the

[*78] checks that it issued to him and by cashing the checks at Ferguson Check Cashing; and he concealed his 2001 income by causing Gulfport Oil & Gas to include false statements on the memo lines of the salary checks that it issued to him and by cashing the checks at Ferguson Check Cashing.  Mr. Durland also concealed his ownership interest in assets by assigning them to Ms. Fausett.  Accordingly, this factor favors a finding of fraud for 1999-2001.

> e. <u>Providing Incomplete or Misleading Information to the Taxpayer's Tax Return Preparer</u>

Mr. Durland provided to Mr. Gibbons the information upon which Gibbons, Gibbons & Buck and GibbonsHall prepared petitioners' 1999-2001 returns.  Mr. Durland appears to have included information relating to the amounts we determined to be income to him in handwritten documents that he gave to Mr. Gibbons for 1999.  Additionally, Mr. Gibbons was aware that Gulfport Oil & Gas was characterizing salaries it paid to its employees in 1999 as loans.

Mr. Durland did not include information relating to the amounts we determined to be income to him in a letter that he sent to Mr. Gibbons for 2000 or in the letters that he sent to Mr. Gibbons for 2001.  Accordingly, this factor does not favor a finding of fraud for 1999 but it does favor a finding of fraud for 2000 and 2001.

**[\*79]**         f.         Offering False or Incredible Testimony

Mr. Durland repeatedly testified that the salary checks he received during 1999-2001 were for loans from various entities to him or for repayments of loans he made to the entities.  He also testified that he gave all of the cash that he received from cashing the checks payable to T.J. Oil & Gas and Gulfport Oil & Gas at Ferguson Check Cashing to Mr. Harris.  His testimony was mostly incredible.  Accordingly, this factor favors a finding of fraud for 1999-2001.

g.         Filing False Documents

Fraudulent intent may be inferred when a taxpayer files a document intending to conceal, mislead, or prevent the collection of tax.  See Spies, 317 U.S. at 499.  Filing false documents with the IRS constitutes "an 'affirmative act' of misrepresentation sufficient to justify the fraud penalty."  Zell v. Commissioner, 763 F.2d 1139, 1146 (10th Cir. 1985), aff'g T.C. Memo. 1984-152.  Mr. Durland filed Federal income tax returns for 1999-2001, and for each year he knowingly omitted substantial amounts of his income.  Accordingly, this factor favors a finding of fraud for 1999-2001.

**[*80]**        h.        Extensive Dealings in Cash

Extensive dealings in cash to avoid scrutiny of a taxpayer's finances is a badge of fraud. See Bradford v. Commissioner, 796 F.2d at 307-308. Fraudulent intent may be inferred when a taxpayer handles his affairs in a manner designed "to avoid making the records usual in transactions of the kind". Spies, 317 U.S. at 499. Mr. Durland cashed numerous checks during each of the years in issue at Ferguson Check Cashing, and he kept large amounts of cash in his office at Gulfport Oil & Gas. This factor favors a finding of fraud for 1999-2001.

        i.        Summary

Many of the badges of fraud are present here. We conclude that respondent has proven by clear and convincing evidence that Mr. Durland underpaid his tax liabilities for 1999-2001 and that some part of the underpayment for each year was due to fraud. Mr. Durland failed to prove that any portion of the underpayment for any of the years in issue was not attributable to fraud. Accordingly, to the extent that we sustain respondent's deficiency determinations, see supra part III.D-F, we hold that Mr. Durland is liable for section 6663(a) civil fraud penalties for each of the years in issue.

**[\*81]** V.     Whether Ms. Fausett Is Jointly and Severally Liable

A.     Joint and Several Liability Generally

Pursuant to section 6013(a) spouses may file a joint Federal income tax return.  Spouses who elect to file a joint return for a taxable year are required to compute their tax for the taxable year on the aggregate income of both spouses, and the liability for that tax is joint and several.  See sec. 6013(d)(3).  However, to remedy certain injustices that may occur, section 6015 allows a spouse to obtain relief from joint and several liability in certain circumstances.

Section 6015(a)(1) provides that a spouse who has made a joint return may seek relief from joint and several liability under subsection (b) (dealing with relief from liability for an understatement of tax with respect to a joint return).  Section 6015(a)(2) provides that an eligible spouse may elect to limit that spouse's liability for any deficiency with respect to a joint return under subsection (c) (providing relief from joint and several liability for taxpayers who are no longer married, are legally separated, or are no longer living together).  If a taxpayer does not qualify for relief under either subsection (b) or (c), the taxpayer may seek equitable relief under subsection (f).

**[*82]**	1.	Section 6015(b)

Under section 6015(b)(1)(A)-(E), the following requirements must be satisfied for the IRS to grant relief from joint and several liability:  (1) the spouses filed a joint return for the taxable year; (2) an understatement of tax is attributable to an erroneous item of the nonrequesting spouse; (3) the requesting spouse establishes that in signing the return he or she did not know, and had no reason to know, of the understatement; (4) after taking into account all the facts and circumstances, it is inequitable to hold the requesting spouse liable for the deficiency attributable to the understatement; and (5) the requesting spouse timely elects the benefits of subsection (b).

2.	Section 6015(c)

Under section 6015(c), if the requesting spouse is either (1) no longer married to the nonrequesting spouse, (2) legally separated from the nonrequesting spouse, or (3) not a member of the same household as the nonrequesting spouse during the 12-month period ending on the date such election is filed, the requesting spouse may elect to limit his or her liability for a deficiency as provided in subsection (d).  Sec. 6015(c)(1), (3)(A)(i).  A requesting spouse may elect section 6015(c) relief any time after the Secretary asserts a deficiency but no later

[*83] than two years after the date on which the Secretary has begun collection activities with respect to the requesting spouse. Id. subsec. (c)(3)(B).

Section 6015(d) provides that, in general, any items giving rise to a deficiency on a joint return are allocated to the spouses as if they had filed separate returns. See id. subsec. (d)(3)(A). The allocation is made without regard to community property laws. See id. subsec. (a) (flush language). The requesting spouse is liable only for his or her proportionate share of the deficiency that results from such allocation. See id. subsec. (d)(1). If an item giving rise to a deficiency provided a tax benefit on the joint return to the nonrequesting spouse, the item is allocated to the nonrequesting spouse. See id. subsec. (d)(3)(B). The requesting spouse bears the burden of establishing the amount of the deficiency allocable to him or her. See id. subsec. (c)(2).

Relief under section 6015(c) is not available where the Commissioner proves that the requesting spouse had "actual knowledge, at the time such individual signed the return, of any item giving rise to a deficiency * * * which is not allocable to such individual". Id. subsec. (c)(3)(C). Actual knowledge is "an actual and clear awareness (as opposed to reason to know) of the existence of an item which gives rise to the deficiency (or portion thereof)." Cheshire v. Commissioner, 115 T.C. 183, 195 (2000), aff'd, 282 F.3d 326 (5th Cir. 2002). In

[*84] a case of omitted income the requesting spouse must have had an actual and clear awareness of the factual circumstances that resulted in the omission of the income. See King v. Commissioner, 116 T.C. 198, 204 n.6 (2001) (citing Cheshire v. Commissioner, 115 T.C. 183); Cheshire v. Commissioner, 115 T.C. at 195; see also sec. 1.6015-3(c)(2)(i)(A), Income Tax Regs. The requesting spouse has actual knowledge when he or she knows that the item giving rise to the deficiency is incorrectly reported on the tax return. See Cheshire v. Commissioner, 115 T.C. at 195. The Commissioner bears the burden of proving by a preponderance of the evidence that the requesting spouse had actual knowledge when signing the return of any item giving rise to the deficiency. See sec. 6015(c)(2), (3)(C); Culver v. Commissioner, 116 T.C. 189, 195 (2001); sec. 1.6015-3(c)(2)(i), Income Tax Regs.

Even when the requesting spouse has actual knowledge of any item giving rise to the deficiency, he or she may still be entitled to section 6015(c) relief if the return was signed under duress. Sec. 6015(c)(3)(C). The exception for duress focuses on the existence or nonexistence of duress in signing the return. Id. The regulations define duress for the purposes of section 6015(c):

> Abuse exception.--If the requesting spouse establishes that he or she was the victim of domestic abuse prior to the time the return was signed, and that, as a result of the prior abuse, the requesting

**[*85]** spouse did not challenge the treatment of any items on the
return for fear of the nonrequesting spouse's retaliation, the limitation
on actual knowledge in this paragraph (c) will not apply. * * *

Sec. 1.6015-3(c)(2)(v), Income Tax Regs. Duress is therefore established for

purposes of section 6015(c) if the requesting spouse proves that he or she was a

victim of domestic abuse and that he or she did not challenge the treatment of any

items on the return for fear of the nonrequesting spouse's retaliation. Id. The

requesting spouse has the burden of proving that he or she signed the return under

duress. See sec. 6015(c)(3)(C).

Because a spouse seeking relief from joint and several liability under

section 6015 has an incentive to exaggerate the degree of any physical and

psychological abuse to which he or she was subjected, if any, we have generally

required substantiation, or at least specificity in allegations, of both physical and

psychological abuse. See Nihiser v. Commissioner, T.C. Memo. 2008-135, slip

op. at 24-25. We have also tried to distinguish between run-of-the mill marital

strife and genuine physical or psychological abuse. See id., slip op. at 25. This is

often difficult to do when, in so many of these cases, there is no expert testimony

to assist the Court, and the evidence of abuse and duress is limited to the

testimony of the requesting spouse and his or her children and friends,

unsupported by any credible evidence from third parties such as a doctor, police,

**[*86]** or even another court. In <u>Nihiser</u>, we relied upon certain common features of domestic abuse in domestic relations law to identify a nonexclusive list of factors that are indicative of psychological abuse by a spouse. Those factors are: (1) isolating the victim; (2) encouraging exhaustion by, for example, intentionally limiting food or interrupting sleep; (3) behaving in an obsessive or possessive manner; (4) threatening to commit suicide, to murder the victim, or to cause the death of family or friends; (5) using degrading language including humiliation, denial of victim's talents and abilities, and name calling; (6) abusing drugs or alcohol, including administering substances to the victim; (7) undermining the victim's ability to reason independently; or (8) occasionally indulging in positive behavior in order to keep alive hope that the abuse will cease. <u>Id.</u> at 26.

### 3. Section 6015(f)

Under section 6015(f), relief from joint and several liability is available if (1) taking into account all the facts and circumstances, it would be inequitable to hold the requesting spouse liable for any unpaid tax and (2) relief is not available to the requesting spouse under subsection (b) or (c). <u>See</u> sec. 6015(f)(1) and (2).

The Commissioner has published revenue procedures listing the factors that he considers in determining whether he will grant section 6015(f) relief. <u>See</u> Rev. Proc. 2013-34, 2013-43 I.R.B. 397, <u>modifying and superseding</u> Rev. Proc.

**[*87]** 2003-61, 2003-2 C.B. 296. We consider these factors in the light of the attendant facts and circumstances, but we are not bound by them. See Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011).

Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. at 399-400, sets forth seven threshold conditions that a requesting spouse must satisfy to be eligible for relief under section 6015(f): (1) the requesting spouse filed a joint Federal income tax return for the tax year or years for which relief is sought; (2) the requesting spouse does not qualify for relief under section 6015(b) or (c); (3) the claim for relief is timely filed; (4) no assets were transferred between the spouses as part of a fraudulent scheme; (5) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; (6) the requesting spouse did not knowingly participate in the filing of a fraudulent joint return; and (7) the liability from which relief is sought is attributable to an item of the nonrequesting spouse.

When a requesting spouse satisfies the threshold conditions of Rev. Proc. 2013-34, sec. 4.01, the Commissioner considers whether the requesting spouse is entitled to a streamlined determination of equitable relief under section 6015(f) pursuant to Rev. Proc. 2013-34, sec. 4.02, 2013-43 I.R.B. at 400. If a requesting spouse is not entitled to a streamlined determination because the requesting spouse

**[\*88]** does not satisfy all the elements in Rev. Proc. 2013-34, sec. 4.02,[28] the requesting spouse's request for relief may be considered using the equitable relief factors in Rev. Proc. 2013-34, sec. 4.03, 2013-43 I.R.B. at 400.

Under Rev. Proc. 2013-34, sec. 4.03, equitable relief under section 6015(f) may be granted if, taking into account all the facts and circumstances, it would be inequitable to hold the requesting spouse responsible for all or part of the liability. In making the decision, the Commissioner weighs a number of factors, including, but not limited to:

> (a) <u>Marital status</u>. Whether the requesting spouse is no longer married to the nonrequesting spouse as of the date the Service makes its determination. * * *

> (b) <u>Economic hardship</u>. Whether the requesting spouse will suffer economic hardship if relief is not granted. * * *

> (c) <u>Knowledge or reason to know</u>. * * * In the case of an income tax liability that was properly reported but not paid, whether, as of the date the return was filed or the date the requesting spouse reasonably believed the return was filed, the requesting spouse knew or had reason to know that the nonrequesting spouse would not or

---

[28]A requesting spouse is eligible for a streamlined determination if the following elements are satisfied: (1) on the date of the request for relief, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse; (2) on the date the return was filed, the requesting spouse did not know, and had no reason to know, that there was an understatement or deficiency on the joint income tax return; and (3) the requesting spouse will suffer economic hardship if the Commissioner does not grant relief. Rev. Proc. 2013-34, sec. 4.02, 2013-43 I.R.B. 397, 400.

**[*89]** could not pay the tax liability at that time or within a reasonable period of time after the filing of the return. * * *

    (d) <u>Legal obligation</u>. Whether the requesting spouse or the nonrequesting spouse has a legal obligation to pay the outstanding Federal income tax liability. * * *

    (e) <u>Significant benefit</u>. Whether the requesting spouse significantly benefitted from the unpaid income tax liability or understatement. * * *

    (f) <u>Compliance with income tax laws</u>. Whether the requesting spouse has made a good faith effort to comply with the income tax laws in the taxable years following the taxable year or years to which the request for relief relates. * * *

    (g) <u>Mental or physical health</u>. Whether the requesting spouse was in poor physical or mental health. * * *

Id. sec. 4.03(2), 2013-43 I.R.B. at 400-403. No single factor is determinative. Id. at 400.

    B.    <u>Whether Ms. Fausett Is Eligible for Relief Under Section 6015</u>

        1.    <u>Section 6015(c) Relief</u>

Respondent contends that Ms. Fausett is not entitled to relief under section 6015(c) because (1) she had actual knowledge of the unreported income at issue, <u>see</u> sec. 6015(c)(3)(C); (2) she and Mr. Durland transferred assets to each other as part of a fraudulent scheme of theirs, <u>see</u> sec. 6015(c)(3)(A)(ii); sec. 1.6015-1(d), Income Tax Regs.; and (3) she has not proven that the amounts giving rise to the

**[*90]** deficiencies are not allocable to her, <u>see</u> sec. 6015(c)(1), (d). Because we find that Ms. Fausett had actual knowledge of the unreported income at issue and that she did not sign the returns under duress, she is not eligible for section 6015(c) relief.

a. <u>Actual Knowledge</u>

i. <u>1999</u>

We sustained respondent's determination that Mr. Durland had received in 1999 but did not report on petitioners' 1999 return wage income of $55,000. <u>See</u> <u>supra</u> part III.D.1. In September 2000, before petitioners filed their 1999 return, Ms. Fausett stated to the FBI that Mr. Durland had told her that Mr. Gibbons had told him that they could report Mr. Durland's salary as a "loan" on the books. Ms. Fausett was also aware that Mr. Durland received a salary of $10,000 per month from one of Mr. Harris' businesses. Although Mr. Durland cashed the salary checks at Ferguson Check Cashing and the checks all bear dates that are before the date on which Mr. Durland and Ms. Fausett married, Ms. Fausett stated to the FBI that she "know[s] for a fact that * * * [Mr. Durland] received [a] salary from T.J. Oil & Gas * * * up through at least August of 1999". Accordingly, respondent has met his burden of proving that Ms. Fausett had actual knowledge that Mr. Durland received $55,000 in unreported wages in 1999.

[*91] We also sustained respondent's determination that Mr. Durland had received unreported diverted corporate income of $435,000 from Gulfport Oil & Gas in 1999, which Mr. Durland had classified as loans to avoid paying taxes. See supra part III.D.2. When Ms. Fausett signed the 1999 return she knew that Mr. Durland had no intention of repaying the purported loans. Ms. Fausett also knew that Mr. Durland received the unreported diverted corporate income as purported loans to avoid paying taxes. Accordingly, respondent has met his burden of proving that Ms. Fausett had actual knowledge that Mr. Durland received diverted corporate income of $435,000 in 1999.

ii.    2000

We sustained respondent's determination that Mr. Durland had received wage income of $5,000 from T.J. Oil & Gas in 2000 that he did not report on petitioners' 2000 tax return. See supra part III.E.1. Ms. Fausett was aware that Mr. Durland received a salary of $10,000 per month from one of Mr. Harris' businesses. In September 2000 Ms. Fausett stated to the FBI that Mr. Durland had classified his salary as loans to avoid paying taxes. Accordingly, respondent has met his burden of proving that Ms. Fausett had actual knowledge that Mr. Durland received $5,000 in unreported wages from T.J. Oil & Gas in 2000.

[*92] We sustained respondent's determination that Mr. Durland had received wage income of $122,500 from Gulfport Oil & Gas in 2000 that he did not report on petitioners' 2000 tax return. See supra part III.E.2. Ms. Fausett stated to the FBI that, on May 10, 2000, Mr. Durland had testified in court that he had not received a salary since March 15, 2000, and that she "know[s] for a fact he was still getting salary." Even with this knowledge, Ms. Fausett signed the 2000 return that reported only $25,000 of wages.[29] Ms. Fausett therefore knew that the amount of wages reported for the 2000 taxable year was incorrect. Respondent has met his burden of proving that Ms. Fausett had actual knowledge that Mr. Durland received unreported wages of $122,500 from Gulfport Oil & Gas in 2000.

We sustained respondent's determination that Mr. Durland had received but did not report on petitioners' 2000 return diverted corporate income of $555,922 from Gulfport Oil & Gas. See supra part III.E.3. The diverted corporate income was from the sale of ARXA stock and production checks from Eagle Energy. Before February 2000 Ms. Fausett regularly received the production checks from Eagle Energy. After February 2000 Mr. Durland received and cashed the production checks. On May 15, 2000, Mr. Durland told Ms. Fausett that he had

---

[29]The reported wages were from ARXA. Mr. Durland and Ms. Fausett reported no wages from T.J. Oil & Gas or Gulfport Oil & Gas.

[*93] been receiving the production checks. When Mr. Durland and Ms. Fausett incorporated Boleyn Energy in October 2000, Mr. Durland told Ms. Fausett that he had deposited into the Boleyn Merrill Lynch account the funds from the production checks he had previously cashed. After October 2000 petitioners assigned Ms. Fausett's interest in the Matagorda lease to Boleyn Energy. Ms. Fausett and Mr. Durland subsequently purchased the Prytania Street house in April 2001 with funds from the production checks that had been deposited in the Boleyn Merrill Lynch account. Petitioners did not file their 2000 return until October 17, 2001. Ms. Fausett therefore knew that Mr. Durland had received diverted corporate income in the form of production checks from Eagle Energy that petitioners did not report on their 2000 return.

Ms. Fausett also stated to the FBI in September 2000 that Gulfport Oil & Gas was selling ARXA stock to investors, and Ms. Fausett witnessed promissory notes for some stock purchases. Ms. Fausett told the FBI that Gulfport Oil & Gas was receiving the funds from the sales but that Mr. Durland would subsequently receive 39% of the income to correspond with his interest in Gulfport Oil & Gas. Respondent has therefore met his burden of proving that Ms. Fausett had actual knowledge that Mr. Durland had received diverted corporate income from the sale of ARXA stock during 2000 that petitioners did not report on their 2000 return.

**[*94]**               iii.     <u>2001</u>

We sustained respondent's determination that Mr. Durland had received wage income of $45,000 from Gulfport Oil & Gas in 2001 that he did not report on petitioners' 2001 return. <u>See</u> <u>supra</u> part III.F. Although Mr. Durland and Ms. Fausett lived apart during most of the relevant part of 2001, Ms. Fausett knew that Mr. Durland received a salary of $10,000 a month from one of Mr. Harris' businesses. Mr. Durland moved in with Ms. Fausett in November 2001 after resigning from Gulfport Oil & Gas in September. Even with the knowledge that Mr. Durland had worked for Gulfport Oil & Gas until September 2001, Ms. Fausett signed petitioners' 2001 tax return reporting no wages. Accordingly, respondent has met his burden of proving that Ms. Fausett had actual knowledge that Mr. Durland had received $45,000 in unreported wages from Gulfport Oil & Gas in 2001.

               b.     <u>Duress Exception</u>

Respondent has satisfied his burden of proving that Ms. Fausett had actual knowledge of the items giving rise to the deficiencies during the 1999-2001 taxable years. <u>See</u> <u>supra</u> part V.B.1.a. Ms. Fausett asserts that she signed the 1999-2001 joint tax returns under duress and that she should be relieved of joint and several liability for the deficiencies as a result. We therefore consider

[*95] whether Ms. Fausett qualifies for the duress exception under section 6015(c)(3)(C).

During trial Ms. Fausett testified generally that Mr. Durland physically and psychologically abused her throughout the years at issue. Additionally, the record reflects that Ms. Fausett was unable to obtain records of her income and expenses for the 1999 return, which she claims led her to sign the joint return. We will address whether the abuse or the inability to obtain records constitutes duress for the purpose of section 6015(c)(3)(C).

For the Court to find duress for the purpose of section 6015(c)(3)(C), Ms. Fausett must substantiate, or at least provide detailed and credible testimony of physical or psychological abuse. See Pullins v. Commissioner, 136 T.C. at 454; Nihiser v. Commissioner, slip op. at 24-25. Even if the Court were to find Ms. Fausett's testimony credible, which it does not, see supra part I.A, Ms. Fausett never substantiated or testified with specificity regarding her alleged abuse. Ms. Fausett testified about generic threats and three alleged instances of physical abuse, but her testimony was not substantiated by any third party[30] and no police report was filed. Ms. Fausett also never proved she signed any returns because of

_____

[30]Ms. Fausett testified that there were witnesses to instances of physical abuse, but none of those alleged witnesses testified at trial.

[*96] fear of retaliation.  See sec. 1.6015-3(c)(2)(v), Income Tax Regs.  Therefore, Ms. Fausett has not met her burden of proving that she signed the returns under duress due to physical or psychological abuse.  See sec. 6015(c)(3)(C).

Ms. Fausett also contends that because Mr. Durland refused to provide her with records she was forced to file jointly.  Before Ms. Fausett and Mr. Durland filed their joint return on October 16, 2000, Ms. Fausett had requested documents from Mr. Durland presumably to file her own individual return.  Duress under section 6015 requires evidence of physical or psychological abuse, and because of that abuse, a fear that the nonrequesting spouse will retaliate if the requesting spouse does not sign the return.  See sec. 1.6015-3(c)(2)(v), Income Tax Regs.  The refusal to provide records is not duress as contemplated by section 6015.  Ms. Fausett did not sign the joint 1999 return under duress but rather, as indicated in her statements to the FBI in September 2000, she signed the return because she was concerned about late filing penalties and interest if she was to file individually.  Although Ms. Fausett attempted to obtain financial records, she never sought the advice of a tax professional to assist her with filing an individual 1999 return.  Moreover, it is unclear what records Ms. Fausett needed to file her return because she had been receiving the production checks from the Matagorda leases until February 2000.  The record does not reflect that Ms. Fausett paid

[*97] expenses with respect to the Matagorda leases, and in fact liens were filed in June 2000 for unpaid operating expenses. Furthermore, Ms. Fausett did not prove that she signed the returns for the years at issues because of fear of retaliation.[31] Ms. Fausett is therefore not entitled to section 6015(c) relief.

### 2. Section 6015(b) Relief

Section 6015(b)(1)(C) provides that an individual requesting section 6015(b) relief must not know or have reason to know that an understatement existed. The actual knowledge requirement under section 6015(c)(3)(C) is narrower than the knew-or-should-have-known standard under section 6015(b)(1)(C). See Cheshire v. Commissioner, 115 T.C. at 195. Because Ms. Fausett had actual knowledge, see supra part V.B.1.a, of the items giving rise to the deficiency, she is ineligible for section 6015(b) relief, see Alt v. Commissioner, 119 T.C. 306, 313 (2002) (requiring a taxpayer to satisfy all section 6015(b) requirements to qualify for relief under that subsection), aff'd, 101 F. App'x 34 (6th Cir. 2004).

---

[31]Ms. Fausett may have feared that Mr. Durland would proceed with the divorce proceeding in Mississippi if she did not sign the 1999 return. The abuse exception of sec. 6015(c)(3)(A) requires that the requesting spouse prove that she was a victim of domestic abuse and because of that abuse, she signed the return out of fear of retaliation. See sec. 1.6015-3(c)(2)(v), Income Tax Regs. Although a divorce proceeding may give rise to mental anguish, the Court does not find that it rises to the level of domestic abuse in these cases.

**[*98]**      3.      Section 6015(f) Relief

Although this Court is not bound by the factors in Rev. Proc. 2013-34, supra, we generally consider those guidelines. See Pullins v. Commissioner, 136 T.C. at 438-439. We first consider whether Ms. Fausett satisfies the threshold conditions of Rev. Proc. 2013-34, sec. 4.01, for equitable relief under section 6015(f). We next consider whether equity entitles Ms. Fausett to section 6015(f) relief.

As a threshold condition for section 6015(f) relief, the requesting spouse must not knowingly participate in the filing of a fraudulent joint return. Rev. Proc. 2013-34, sec. 4.01(6). Although Ms. Fausett is not liable for the fraud penalties, we have determined that the tax returns were fraudulent and that Mr. Durland is liable for civil fraud penalties. See supra part IV.B.3. Ms. Fausett signed these returns while knowing that income had been omitted from them. See supra part V.B.1.a. Accordingly, Ms. Fausett does not satisfy this threshold condition for equitable relief under section 6015(f).

Even if Ms. Fausett had not knowingly participated in the filing of a fraudulent joint return, she would not be eligible for relief because Mr. Durland and Ms. Fausett transferred assets between them as part of a fraudulent scheme. Another threshold condition of Rev. Proc. 2013-34, sec. 4.01(4), is that "no assets

[*99] were transferred between the spouses as part of a fraudulent scheme by the spouses." The disqualifying transfer in this case relates to the May 2001 purchase of the Prytania Street house. In purchasing the house Mr. Durland and Ms. Fausett used funds from an account owned by Boleyn Energy. The Prytania Street house was titled in Ms. Fausett's name. The funds in the Boleyn Energy account were-- at least in part-- amounts paid to Mr. Durland, Ms. Fausett, or Boleyn Energy under the Matagorda lease, and Ms. Fausett and Mr. Durland each owned half of Boleyn Energy's stock. By May 2001 Ms. Fausett knew that the purpose of the well assignments was to defraud ARXA and Gulfport Oil & Gas' creditors and the IRS. She also must have known that Mr. Durland insisted on having the Prytania Street house titled only in her name because he wanted to place his assets (i.e., his portion of the funds in the Boleyn account that he owned) beyond the reach of his creditors, including creditors of ARXA and Gulfport Oil & Gas and the IRS. Nevertheless, she agreed to this arrangement. Mr. Durland therefore transferred assets under his control to Ms. Fausett as part of a fraudulent scheme.

Subsequent events support our conclusion that Mr. Durland transferred assets to Ms. Fausett as part of a fraudulent scheme. Specifically, Ms. Fausett later transferred the Prytania Street house to Trinity Art. She then caused Trinity Art to transfer the house back to her so that she could obtain a loan on the Prytania

[*100] Street house and then transferred the house back to Trinity Art. We infer from these transfers that Mr. Durland and Ms. Fausett no longer thought that having the Prytania Street house titled in Ms. Fausett's name was sufficient to protect the assets from Mr. Durland's creditors. Although Ms. Fausett testified that Mr. Durland had told her to transfer the house to Trinity Art because she was selling art and antiques from the house, we do not find Ms. Fausett's testimony in this regard to be credible. Mr. Durland also placed other assets, such as the Matagorda lease, as well as income that he earned, in Ms. Fausett's name, ostensibly to hide the assets and income from creditors throughout the years at issue. Ms. Fausett is therefore disqualified from equitable relief under section 6015(f).[32] See id.

Assuming arguendo that Ms. Fausett satisfied the threshold conditions for section 6015(f) relief, equities do not weigh in her favor. Although Ms. Fausett was not married to Mr. Durland when she requested section 6015 relief and although she was in compliance with her tax obligations for years after the years at issue,[33] Ms. Fausett had actual knowledge of the understatements for the years at

---

[32]A requesting spouse also is not eligible for sec. 6015(c) relief when assets were transferred as part of a fraudulent scheme. Sec. 6015(c)(3)(A)(ii).

[33]Respondent concedes that both of these factors favor granting relief to Ms.

(continued...)

[*101] issue.  See supra part V.B.1.a.  Moreover, Ms. Fausett never proved with any credible evidence that she would suffer economic hardship if relief was not granted.  Additionally petitioners' divorce decree states that the tax liabilities for the years at issue are each party's responsibility.[34]  Ms. Fausett received significant benefits from the understatements of tax including an investment account in her name, expensive jewelry, homes, and a luxury car.  Ms. Fausett testified that she was in poor mental health and attended counseling during the years at issue, but Ms. Fausett never introduced any credible evidence to corroborate her claims.  Accordingly, the Court is not convinced that equities weigh in Ms. Fausett's favor.

Ms. Fausett contends that this Court should grant equitable relief even if equities do not weigh in her favor because of Mr. Durland's physical and psychological abuse.  Rev. Proc. 2013-34, sec. 3.01, 2013-43 I.R.B. at 398, gives greater deference to the presence of abuse than previous guidelines and recognizes that when abuse is present, it may affect the analysis and possibly negate the presence of other unfavorable factors.  We have already considered whether Ms.

---

[33](...continued)
Fausett.

[34]Rev. Proc. 2013-34, sec. 4.03(2)(d), 2013-43 I.R.B. at 402, states that the legal obligation factor is neutral when the tax liabilities are each party's responsibility.

**[*102]** Fausett had proven abuse for purposes of the duress exception under section 6015(c)(3)(C), and we have found that the alleged abuse was not substantiated.  See supra part V.B.1.b.  The record simply does not support a finding that Ms. Fausett was abused such that the abuse would negate the factors that weigh against granting her section 6015(f) relief.  Her evidence was uncorroborated and unmoving and her actions during the years at issue were not consistent with her testimony at trial.  Accordingly, we conclude that Ms. Fausett is not entitled to relief from joint and several liability under any subsection of section 6015.

## VI.   Conclusion

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

Decisions will be entered under

Rule 155.